James Leroy JACKSON,
Plaintiff-Appellee,

v.

JOHNS–MANVILLE SALES CORPORATION and Raybestos-Manhattan, Inc.,
Defendants-Appellants.

No. 82–4288.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1985.

Alvin B. Rubin, Circuit Judge, filed concurring opinion.

Clark, Chief Judge, dissented and filed an opinion in which Gee, Garza, Politz and E. Grady Jolly, Circuit Judges, joined.

Roy C. Williams, Pascagoula, Miss., Lively M. Wilson, Dorothy J. Chambers, Louisville, Ky., John H. Holloman, III, William N. Reed, Jackson, Miss., for defendants-appellants.

Richard F. Pate, Mobile, Ala., Danny E. Cupit, Jackson, Miss., Ronald L. Motley, Barnwell, S.C., Arthur R. Miller, Harvard Law School, Cambridge, Mass., for plaintiff-appellee.

Joseph R. Steele, Port Arthur, Tex., for amicus curiae-Abestos Claimants in the State of Tex.

Adolph J. Levy, New Orleans, La., for amicus curiae-The Ass'n of Trial Lawyers of America.

Broadus A. Spivey, Austin, Tex., for amicus curiae-Broadus A. Spivey.

Before CLARK, Chief Judge, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, GARWOOD,

JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.*

RANDALL, Circuit Judge:

In this Mississippi diversity case, plaintiff James L. Jackson, a former shipyard worker, seeks recovery of actual and punitive damages against defendants Johns-Manville Sales Corporation, Raybestos-Manhattan, Inc., and H.K. Porter Company, manufacturers of asbestos products, for injuries allegedly caused by the defendants' failure to warn of the dangers associated with exposure to their asbestos products. Following extensive discovery and a lengthy jury trial, the district court entered judgment in favor of Jackson and against all defendants except H.K. Porter Company for $391,500 in compensatory damages and $625,000 in combined punitive damages. On appeal, a panel of this court affirmed in part, reversed in part, and remanded the case for a new trial. *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506 (5th Cir.1984). We granted en banc rehearing, 727 F.2d at 533, and now decide to certify to the Mississippi Supreme Court three significant questions of Mississippi law.

## I. FACTUAL AND PROCEDURAL HISTORY.

The panel opinion fully sets forth the facts of this case, 727 F.2d at 509–11, and so we repeat them here only in summary fashion.

James L. Jackson worked for Ingalls Shipbuilding Corporation (Ingalls) at its yard in Pascagoula, Mississippi, from 1953 until 1971. During his tenure at Ingalls, Jackson worked first as a sheet-metal mechanic and then as a work leaderman or supervisor. As a sheet-metal mechanic, Jackson drilled holes in asbestos-containing materials and cut gaskets from asbestos cloth. While working as a work leaderman, Jackson was required to move around naval ships amidst craftsmen making extensive use of asbestos products. There is no question that Jackson in both capacities was exposed to significant quantities of asbestos dust.

Approximately seven years after leaving Ingalls, Jackson was diagnosed as having asbestosis, a progressive and incurable pulmonary disease caused by exposure to asbestos. As a result of the asbestosis, Jackson's life expectancy was reduced and his lung capacity significantly impaired. Moreover, Jackson alleges that his exposure to the asbestos markedly increased his risk of contracting lung cancer and other malignancies. On November 21, 1978, Jackson joined with several other parties in filing a class action in federal district court against a number of manufacturers and sellers of asbestos materials that were allegedly used at Ingalls. Following the district court's denial of class certification, Jackson filed an amended complaint against twelve defendants, eight of whom settled and one of whom was granted summary judgment. By the time of trial, the remaining defendants were Johns-Manville Sales Corporation (Johns-Manville); H.K. Porter Company, Inc. (H.K. Porter); and Raybestos-Manhattan, Inc. (Raybestos-Manhattan).[1]

Jackson argued at trial that the three defendants were liable under the Mississippi law of strict liability for manufacturing and selling asbestos products made unreasonably dangerous by the defendants' failure to warn of the products' inherent hazards. In addition, Jackson sought to recover punitive damages on the ground that the defendants had conspired to suppress information concerning the dangers of asbestos exposure and the disease of asbestosis for more than three decades. In response, the defendants contended principally that, because they neither knew nor had reasonable grounds to believe that their asbestos products posed any significant danger to shipyard workers, they could not be held responsible for Jackson's injuries. The jury found that Johns-Manville and Raybes-

---

*Judge Jerre S. Williams did not participate in the decision of this case.

1. In Part II of this opinion, only Johns-Manville and Raybestos-Manhattan will be referred to as "defendants."

tos-Manhattan were strictly liable to Jackson for $391,500 in compensatory damages. The jury also imposed punitive damages of $500,000 against Johns-Manville and $125,000 against Raybestos-Manhattan. Finally, H.K. Porter was found to be not liable to Jackson. The district court entered judgment accordingly.

On appeal, a panel of this court affirmed in part, reversed in part, and remanded. 727 F.2d 506. Following an extensive review of both Mississippi caselaw and the instant record, the panel found that the district court had accurately applied the Mississippi law of strict liability and that sufficient evidence was adduced at trial to support the necessary finding of proximate cause. The panel moreover affirmed the trial court's refusal to disclose to the jury the amounts for which Jackson had previously settled with eight of the initial defendants. The panel, nonetheless, ordered a new trial on the ground that the district court had committed reversible error in admitting two items of evidence that posed a substantial danger of unfair prejudice. First, the panel found that, because (1) Jackson did not allege that he suffered from cancer and (2) it was clearly established at trial that asbestosis itself does not cause or lead to cancer, the evidence of Jackson's increased risk of contracting cancer introduced at trial was irrelevant or at least should have been excluded under Federal Rule of Evidence 403. The panel left to the district court's initial discretion on retrial whether evidence of Jackson's fear of cancer should be admitted and whether such a claim was even permitted by the pleadings. Second, the panel held that the "Sumner Simpson papers" were too remote in time and too attenuated in subject matter to be probative of any material fact and thus also should have been excluded under rule 402 for irrelevancy or at least under rule 403 for being unduly prejudicial. Finally, the panel held that the district court also erred in allowing the recovery of punitive damages. According to the panel, punitive damages are inappropriate "where

the allowance of punitive damages carries the manifest portent of undoing the strict liability remedy for present and prospective claimants and where the purposes of punitive damages are otherwise served." 727 F.2d at 529. This court voted to rehear the case en banc, 727 F.2d at 533, thereby vacating the panel opinion. *See* Fifth Circuit Local Rule 41.3.

## II. DISCUSSION.

At the outset, we reinstate Parts II, V, and VIII of the panel opinion, denominated "Strict Liability in Tort," "Proximate Causation," and "Disclosure to Jury of Settlement Amounts," respectively. The remainder of the panel opinion is superseded in its entirety by this opinion. Because the defendants, in their briefs before the panel, attacked the portion of the judgment awarding compensatory damages primarily by means of challenges to the admissibility of certain evidence, rather than challenges to the substantive law applied, we address first their evidentiary challenges and then turn to their substantive law challenges.

### A. *Evidentiary Issues.*

#### 1. The Sumner Simpson Papers.

Johns-Manville and Raybestos-Manhattan contend that the district court committed reversible error by admitting three of the so-called "Sumner Simpson papers."[2] These papers consist of, among other things, correspondence to and from Sumner Simpson, who occupied a dominant position in Raybestos-Manhattan from 1929 until his death in 1953. The first letter, dated September 25, 1935, was written by A.F. Rossiter of *Asbestos* magazine to Simpson. In this letter, Rossiter refers to previous requests made by Simpson that nothing be published in that magazine concerning the hazards posed by asbestos dust. In the second letter, dated October 1, 1935, Simpson states to Vandiver Brown, Johns-Manville's attorney, that "the less said about asbestos, the better off we are." Simpson in the same letter also refers to English articles on asbestos dust control

---

**2.** These letters are set out in full in the appendix to the panel opinion. *See* 727 F.2d at 532–33.

and comments that *Asbestos* has "been very decent about not re-printing the English articles." Finally, in the third letter, dated two days later, Brown replies: "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity." He also suggests that, if they should decide eventually not to object to the publication of such an article, American instead of English data should be used on the theory that the asbestos dust was "considerably milder" in North America.

■ Under Federal Rule of Evidence 401, evidence meets the threshold test of relevancy [3] if the evidence tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R. Evid. 401; *see also Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344, 347 (5th Cir. 1983). Jackson introduced the Sumner Simpson letters into evidence to show, *inter alia*, that Johns-Manville and Raybestos-Manhattan knew or should have known of the dangers asbestos products posed to shipyard workers during the years Jackson worked in that capacity at Ingalls. Under Restatement (Second) of Torts § 402A comment j,[4] a manufacturer is only required to warn of dangers of which he knew or should have known "by the application of reasonable, developed human skill and fore-

sight." *See also Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1089 (5th Cir.1973) (manufacturer is held to knowledge and skill of an expert), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

The defendants argue that the letters are of no probative value as to foreseeability because they refer only to the danger faced by miners and plant workers in being exposed to raw asbestos, and it was clearly established at trial that Jackson worked solely with finished asbestos products. We note as an initial matter that the texts of the letters themselves do not limit their discussion to miners or plant workers. Rather, on their face, the letters appear to pertain to the problems of asbestos dust control in general. Nevertheless, even assuming that the defendants are correct in their contention that the letters refer only to certain groups of workers, we think that such a distinction plainly goes more to the weight than to the admissibility of the evidence. A study indicating that exposure to asbestos fibers is likely to cause harm to one group of workers is at least suggestive of the fact that other groups of workers who are also exposed to asbestos fibers face similar dangers. The letters were not so remote in subject matter as to be devoid of probative value.

Nor do we believe that the letters are irrelevant because they were written twen-

**3.** Federal Rule of Evidence 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Fed.R.Evid. 402.

**4.** Restatement (Second) of Torts § 402A comment j reads in pertinent part:

*j. Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial

number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

\* \* \* \* \* \*

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

ty years before Jackson began to work at Ingalls. Jackson alleged at trial that the defendants knew of the dangers posed by asbestos at least between 1953 and 1971, the time during which he handled the asbestos products. Evidence that the defendants had such knowledge in 1935 clearly makes Jackson's allegation that the dangers of the asbestos products were foreseeable in 1953 more probable than it would have been without such evidence. It remains for the jury to determine whether after-acquired knowledge was sufficient to absolve the defendants of a duty to warn.[5]

Although relevant, evidence can be excluded under Federal Rule of Evidence 403 [6] if its probative value is substantially outweighed by the danger of unfair prejudice. A trial court's determination under rule 403, however, will not be reversed absent a finding of an abuse of discretion. *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1153 (5th Cir.1981); *King v. Ford Motor Co.*, 597 F.2d 436, 445 (5th Cir.1979). We find no abuse of discretion on the part of the district court. Nothing in the letters is of such an inherent nature as to inflame the passions of the jury or invoke its sympathies. Moreover, counsel for Johns-Manville and Raybestos-Manhattan had ample opportunity, of which they took full advantage, to ensure that the jury fully appreciated the remoteness of the letters both in time and in subject matter. The slight danger that the admission of such evidence would have caused sufficient unfair prejudice to warrant exclusion was properly ignored.[7] *See Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir. 1983); *United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir.1974).[8]

2. Admission of Cancer Evidence.

At trial, a number of expert witnesses testified that Jackson's exposure to asbestos significantly increased his risk of contracting cancer. Three of these expert witnesses testified both that exposure to asbestos generally results in some increased risk of cancer and that, based upon Jackson's medical records and history of asbestos exposure, it could be estimated that Jackson specifically had a greater than fifty percent chance of contracting asbestos-related cancer in the future. On appeal,

---

**5.** The panel opinion relies on the famous Fleischer-Drinker Report of 1946, Fleischer, Viler, Gade & Drinker, *A Health Survey of Pipe Covering Operations in Constructing Naval Vessels*, 28 J.Indus. Hygiene & Toxicology 9 (1946), as an example of the research developments that occurred between 1935 and 1953. Other evidence presented at trial, however, supports Jackson's claim that his injuries remained foreseeable in the 1940's and 1950's. *See, e.g.,* Testimony of Dr. Gerrit Schepers, Record, Vol. 49, at 437–76. *See generally* Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,* 36 Vand.L.Rev. 573, 596–605 (1983) (evidence available to prove foreseeability against asbestos manufacturers). We are unable to say that as a matter of law the knowledge acquired after 1935 excused the defendants from performing any duty they might have had to place warnings on their asbestos products. *See Moran v. Johns-Manville Sales Corp.,* 691 F.2d 811, 814–15 (6th Cir.1982) (evidence introduced at trial of known or knowable risks to insulation workers was ample).

**6.** Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

**7.** We reject out of hand defendants' contention that the fact that H.K. Porter was found not to be liable proves "beyond rational debate" the undue prejudicial nature of the Sumner Simpson papers. As the panel noted, " '[w]hether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty ... is immaterial. Juries may indulge in precisely such motives or vagaries.' " 727 F.2d at 524 (quoting *Borel, supra,* at 1094; original from *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943)).

**8.** Johns-Manville also alleges that the district court committed reversible error by admitting numerous other pieces of evidence that were of such a nature as to create a substantial danger of unfair prejudice. These items all were introduced to show that Johns-Manville had knowledge of asbestos' dangers decades before Jackson began working for Ingalls. For essentially the same reasons as those stated above, we find no abuse of discretion.

Johns-Manville and Raybestos-Manhattan assert that admission of this evidence was prejudicial error because the relationship between asbestos and cancer was not relevant to any issue in the case. In addition, they argue that, even if such evidence was relevant, its emotional impact substantially outweighed its probative value. In response, Jackson alleges that the evidence was in fact relevant to and quite probative of the defendants' liability, his mental anguish resulting from his increased risk of cancer, and the availability of prospective damages associated with cancer.

■ Turning first to the admissibility of cancer evidence to show liability, we find that under rule 401 cancer evidence was relevant with respect to whether the defendants had a duty to warn. In *State Stove Manufacturing Co. v. Hodges*, 189 So.2d 113 (Miss.1966), *cert. denied*, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967), the Mississippi Supreme Court adopted Restatement (Second) of Torts § 402A,[9] at least insofar as it subjects manufacturers to strict liability for injuries caused by their products sold in an unreasonably dangerous condition. Comment k to § 402A[10] provides that some products

inherently unsafe can be prevented from being unreasonably dangerous by furnishing the user with an adequate warning of the hazards of the product. *See Borel v. Fibreboard Paper Products Corp., supra,* at 1089–90; *Alman Bros. Farms & Feed Mill, Inc., v. Diamond Laboratories, Inc.,* 437 F.2d 1295, 1302–03 (5th Cir.1971); *Pridgett v. Jackson Iron & Metal Co.,* 253 So.2d 837, 843–44 (Miss.1971). Because one of the purposes of the warning is to allow the user to make his own decision whether to expose himself to the risks of harm, *Borel, supra,* at 1089, a manufacturer fulfills its duty to warn in this context only if it warns of all dangers associated with its products of which it has actual or constructive knowledge. *See Pavlides v. Galveston Yacht Basin, Inc.,* 727 F.2d 330, 338 (5th Cir.1984); *Karjala v. Johns-Manville Products Corp.,* 523 F.2d 155 (8th Cir.1975); *Borel, supra,* at 1089–90. In establishing the scope of a manufacturer's duty to warn, therefore, evidence of all known or foreseeable hazards posed by the product is relevant. Thus, in the instant case, evidence that asbestos is a carcinogen was clearly probative of the nature and

9. Restatement (Second) of Torts § 402A provides:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

10. Restatement (Second) of Torts § 402A comment k provides in part:

k. *Unavoidably unsafe products.* There are some products which, in the present state

of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since *the disease itself invariably* leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

extent of the defendants' duty and corresponding breach.[11]

Although cancer evidence is relevant to the issue of the defendants' liability, we think that this ground for admission, standing alone, is insufficient under Federal Rule of Evidence 403 to justify the admission of the type and quantity of cancer evidence adduced by the plaintiff here. Jackson introduced no fewer than nine expert witnesses who tied asbestos exposure in some manner to an increased risk of cancer. Three of those experts specifically testified that Jackson in particular had a greater than fifty percent chance of contracting cancer. Johns-Manville and Raybestos-Manhattan argue that the district court abused its discretion in admitting the cancer evidence because the dire symptoms and consequences of the disease are so well known and feared by the general public that extensive evidence on the matter was likely to cause individual members of the jury to act out of unfair prejudice. If the cancer evidence is relevant only to the defendants' liability, we agree with the defendants that the danger of unfair prejudice outweighed its probative value.

Jackson offers, however, two other grounds for the admissibility of the cancer evidence: (1) to establish damages for reasonable mental anguish resulting from his increased risk of cancer and (2) to establish damages in connection with cancer as a future consequence of the complained of condition that is reasonably probable to occur. We think that either ground would justify the inclusion of the evidence in this case, provided, of course, that the damages of which the cancer evidence would be probative were available to Jackson as a matter of law. Thus, because we have decided to certify to the Mississippi Supreme Court the question whether these types of damages are recoverable by Jackson in the present context, see infra Part B3, the final decision as to the admissibility of the cancer evidence must await that court's response to our question. If the Mississippi Supreme Court holds that Jackson has no right in the instant case to recover damages either for cancer as a probable future consequence or for mental anguish for the fear of contracting cancer, then the cancer evidence was wrongly admitted and a new trial will be in order. If, however, the Mississippi Supreme Court rules that either category of damages is recoverable, the cancer evidence was properly admitted.[12]

### B. Substantive Law—Punitive Damages, Mental Anguish and Probable Future Consequences.

In the original appeal of this case, Johns-Manville and Raybestos-Manhattan argued that punitive damages should not be recoverable as a matter of law in the context of asbestos litigation because of certain public policy considerations described below. The defendants also insisted that the district court erroneously allowed the jury to award compensatory damages for mental anguish allegedly associated with Jackson's increased risk of contracting cancer.[13] Fi-

---

**11.** For evidence introduced at trial concerning the foreseeability of an increased risk of cancer following exposure to asbestos, see Testimony of Dr. Gerrit Schepers, Record, Vol. 49, at 410–12; Testimony of Dr. David Ozonoff, Vol. 51, at 105; Testimony of Mr. Hugh Jackson, Vol. 53, at 1624–25.

**12.** We recognize that, if the Mississippi Supreme Court rules that damages for mental anguish are recoverable in this context, but that damages for cancer as a probable future consequence are not, then it could be claimed that the type and quantity of cancer evidence in this case continues to pose too great a risk of unfair prejudice. This distinction between these grounds for admissibility of the cancer evidence would require a different balancing analysis under rule 403.

Because the defendants took an all-or-nothing position at trial with respect to the cancer evidence and have maintained this position on appeal, we do not address this issue. Clearly, if the evidence was admissible as to one kind of damages, but not as to the other, a limiting instruction would have been in order upon request. No request for such an instruction was made in this case.

**13.** The district court never specifically instructed the jury that Jackson could recover such damages. Instead, the district court stated that the following were recoverable:

If you find from a preponderance of the evidence in this case that the plaintiff, James L. Jackson, is entitled to a verdict, against any one or more of the defendants herein, then in

nally, before the en banc court the defendants argued that the district court was also erroneous in allowing the jury to award compensatory damages for cancer as a probable future consequence of Jackson's present condition. Because a plaintiff under Mississippi law can usually recover both types of compensatory damages if they are sufficiently tied to the defendants' wrong, *see Entex, Inc. v. Rasberry*, 355 So.2d 1102, 1103 (Miss.1978) ("where ... future consequences from an injury will ensue, recovery therefor may be had, but such future consequences must be established in terms' of reasonable probabilities"); *Sears, Roebuck & Co. v. Devers*, 405 So.2d 898, 901 (Miss.1981) (damages for mental anguish are recoverable when they are the natural and proximate result of a wrong), whether these damages are available in the instant case may depend on the nature of the actionable injury. If the actionable injury here was the exposure to asbestos, as Jackson insists, he may be entitled to recover damages for those future consequences, such as the manifestation of cancer, that could be established in terms of reasonable probabilities and for the mental suffering that is the direct consequence of the increased risk of cancer caused by the asbestos exposure. If, on the other hand, exposure to asbestos is regarded as too abstract an invasion, either as a general rule or in the context of latent disease, mass tort litigation, and instead Jackson's asbestosis itself is considered to be the only actionable harm, Jackson may have no right to recover these damages since asbestosis alone does not result in an increased risk of cancer. In voting to rehear the case en banc, this court requested the parties additionally to consider in their briefings whether this case was an appropriate one for the fashioning and imposition of federal common law.[14] Upon careful review of the excellent briefs submitted and the applicable caselaw, we now conclude that Mississippi law governs the resolution of the punitive damages, cancer as a probable future consequence, and mental anguish issues. Moreover, because Mississippi courts have yet to give a definite answer to the questions these issues pose, we have determined to certify all three issues to the Mississippi Supreme Court.

that event it would be your sworn duty to fix the amount of your verdict at a sum which will fairly and reasonably compensate him for his injuries, sufferings or conditions of pulmonary disease proved by a preponderance of the evidence to have been sustained as a proximate result of exposure to asbestos fibers emitted from the product or products of a defendant or defendants herein. In calculating the amount of the plaintiff's damages, if any, and these are called either actual or compensatory damages, it would be your sworn duty to take into consideration the following elements:

1. The amount of wages, if any, lost to date by the plaintiff.

2. Any impairment of Mr. Jackson's future wage-earning capacity.

3. The reasonable value of the medical bills and expenses including doctor's fees, hospital services, and medication required to date, for the necessary treatment of his injuries complained of.

4. The reasonable and necessary expenses to Mr. Jackson for doctor, hospital and medication charges which you find from the evidence in this case are reasonably expected to be required in the future for the necessary treatment of his complained of condition.

5. All physical pain and mental anguish suffered by him to date and such as he is reasonably certain to suffer in the future as a direct result of his complained of condition.

In this regard also, you may consider any aggravation of an existing disease or physical defect or activation of any such latent condition, resulting from the injury.

Record, Vol. 56, at 2444. These instructions are sufficiently broad to have allowed the jury, on this record, to award damages for Jackson's asbestosis and mental anguish and for cancer as a probable future consequence of his exposure to asbestos.

**14.** Our request read in pertinent part as follows:

Please refer to the discussion in Part VI of the panel opinion, which appears subsequent to headnote [23] (727 F.2d 526–530). Supplement or include in your briefing in this case a discussion of what consideration *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, and subsequent interpretative decisions would permit this court to give to the impact of punitive damage awards on future federal court litigants notwithstanding Mississippi rules of substantive law.

1. The Unique Nature of Asbestos Litigation.

In advocating the application of federal common law, both the defendants and the dissent distinguish the instant case from routine personal injury actions on the ground that asbestos-related injuries have become a national problem of immense proportions. Studies cited in the panel opinion [15] indicate that in the last forty years over 21 million Americans have been significantly exposed to asbestos. These studies further estimate that at least 200,000 people will die from asbestos-related cancer alone by the end of the century. As a result of the widespread exposure to asbestos, over 20,000 personal injury lawsuits have already been filed, seeking billions of dollars in damages. Johns-Manville reports that it alone is named as a defendant in over 14,000 suits, almost 10,000 of which seek substantial punitive damages in addition to compensatory relief.

It is feared that, unless present plaintiffs are soon limited in the damages they can collect, early recoveries will create a substantial possibility that the responsible corporate entities will be unable to satisfy the compensatory awards of future claimants. Defendants, the dissent, and a number of commentators [16] urge that, specifically, assessments of punitive damages not only threaten to destroy the viability of enterprises through which loss distribution can be accomplished, but also are incapable of fulfilling their dual functions of punishment and deterrence in the face of the asbestos industry's virtual limitless liability. Similarly, awards for mental and prospective damages related to possible future manifestations of a disease, theoretically recoverable when exposure is considered as the actionable injury, require asbestos companies to expend their resources at a more accelerated pace to the detriment of future plaintiffs. To the defendants and the dissent, these problems and the need for national solutions form an ample basis for the formulation of federal common law.

2. The Question of Federal Common Law.

Any discussion of federal common law must begin with *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Erie*, the Supreme Court established that federal courts do not have the general law-making powers commonly exercised by state courts. The *Erie* Court held that federal courts, as courts of limited jurisdiction, are empowered to make only those laws authorized by the Constitution or by enactments of Congress. 304 U.S. at 78, 58 S.Ct. at 822. Nevertheless, since *Erie*, the Supreme Court has recognized "a responsibility in the absence of legislation, to fashion federal common law in cases raising issues of uniquely federal concern." *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 95, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). These instances, however, are "few and restricted." *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1444, 10 L.Ed.2d 605 (1963). With respect to the kinds of cases that do raise issues of "uniquely federal concern," the Supreme Court has most recently stated:

[A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases. In these instances, our federal system does

---

**15.** *See* 727 F.2d at 524. Studies cited include Selikoff, Report to the U.S. Department of Labor, Disability Compensation for Asbestos-Associated Disease in the United States (1982), *reported in* Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control,* 52 Fordham L.Rev. 37, 37 n. 1 (1983); *Congress Grapples with Toxic Torts,* Nat'l L.J., Jan. 31, 1983, at 30, col. 1, *reported in* Seltzer, *supra. See also In re Johns-Manville Corp.,* 36 B.R. 743, 746 (Bankr.S.D.N.Y. 1984) (projection of Johns-Manville's potential liability); Special Project, *supra* note 9, at 580–81.

**16.** *See infra* note 22.

not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.

*Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981).

Johns-Manville and Raybestos-Manhattan, while conceding that Congress has yet to take any action to remedy the problems of asbestos exposure, present what can be taken as two arguments for the proposition that these problems involve uniquely federal concerns justifying the displacement of state law. First, the defendants, echoed by the dissent, argue that the potential conflict among plaintiffs for the limited resources of the asbestos companies is analogous to the interstate conflicts over water rights and pollution that have been held to involve uniquely federal interests. According to the defendants, just as one state cannot divert the waters of a river flowing partially within its borders without regard for those downstream, one group of states should not be able by allowing the recovery of noncompensatory damages to divert and deplete scarce corporate resources at the expense of injured plaintiffs in other states.

We find this argument, although superficially plausible, to be ultimately unpersuasive. Defendants in drawing their analogy necessarily rely on such cases as *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938), and *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). *Hinderlider* concerned the allocation of water rights between Colorado and New Mexico in regard to the La Plata River, which flowed from Colorado to New Mexico and was used benefically by both states. The Supreme Court, in requiring the river to be equally apportioned, held that "whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the statutes nor the decisions of either State can be conclusive." 304 U.S. at 110. Similarly, in *Illinois v. City of Milwaukee*, the Supreme Court, faced with a dispute over water pollution in Lake Michigan, a body of water bounded by four states, found that the conflict was fundamentally interstate in nature and thus touched basic interests in federalism. The Court held that, in such a situation, federal common law applied. 406 U.S. at 105 & n. 6, 92 S.Ct. at 1393 & n. 6.

In both cases, the essential conflict was between states as quasi-sovereign bodies over shared resources. Under such circumstances, a single state's statutes or decisions could not be considered conclusive. In the realm of asbestos litigation, on the other hand, any conflict between plaintiffs, even assuming one to exist, may transcend state lines but does not involve the rights and duties of states as discrete political entities. A conflict over the resources of the asbestos industry would be not merely between plaintiffs in different states but between plaintiffs in the same state and between past, present, and future plaintiffs. Clearly, if federal courts are to remain courts of limited powers as required under *Erie*, a dispute over a common fund or scarce resources cannot become "interstate," in the sense of requiring the application of federal common law, merely because the conflict is not confined within the boundaries of a single state.

■ Second, the defendants argue that there is a uniquely federal interest in assuring compensation to injured persons and in maintaining government asbestos suppliers. Both interests, the defendants insist, would be substantially served by the creation of federal rules restricting the types of damages recoverable in asbestos suits. We think the defendants in making this argument misconceive the nature of the uniquely federal interest requirement. "Uniquely federal interests" are not merely national interests, and the existence of national interests, no matter their significance, cannot by themselves give federal courts the authority to supersede state poli-

cy. Indeed, as the Supreme Court recently stated, "[t]he enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *City of Milwaukee v. Illinois*, 451 U.S. 304, 312–13, 101 S.Ct. 1784, 1789–90, 68 L.Ed.2d 114 (1981) (*Milwaukee II*). It is well-established instead that to be "uniquely federal" and thus a sufficient predicate for the imposition of a federal substantive rule, an interest must relate to an articulated congressional policy or directly implicate the authority and duties of the United States as sovereign. *See, e.g., Texas Industries, supra,* at 641, 101 S.Ct. at 2067 (authority and duties of United States must be "intimately involved"); *Northwest Airlines, supra,* at 95, 101 S.Ct. at 1582 (uniquely federal concern is "the definition of rights and duties of the United States"); *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) (federal law governs rights of United States arising under nationwide federal program); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943) (federal common law governs rights and duties of United States on commercial paper which it issues).

Although individual members and committees of Congress have expressed concern with the problem of asbestos litigation,[17] Congress itself has yet to make policy on this issue. Moreover, defendants have been unable to point to any substantial right or duty of the federal government that would be directly affected by the outcome of this litigation. Any effect state law recoveries would eventually have on the government's ability to obtain needed

materials is far too indirect to justify the imposition of federal common law. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 635 F.2d 987, 993 (2d Cir.1980) (no federal policy at stake in action by war veterans against manufacturers of defoliants used in Vietnam War that is sufficient to warrant creation of federal common law), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *cf. Miree v. DeKalb County,* 433 U.S. 25, 29–32, 97 S.Ct. 2490, 2493–97, 53 L.Ed.2d 557 (1977) (federal interest in air travel insufficient basis for creation of federal law in action between private parties that will have no direct effect on United States or its treasury); *Bank of American National Trust & Savings Ass'n v. Parnell,* 352 U.S. 29, 33–34, 77 S.Ct. 119, 121, 1 L.Ed.2d 93 (1956) (interest of government too speculative and remote in action between private parties that does not touch rights and duties of the United States). Similarly, ensuring the availability of compensation for injured plaintiffs is predominately a matter of state concern and, in the absence of congressional enactments, state law, both as to the extent of compensation available and punitive damages, must apply. As recently as last term, the Supreme Court reaffirmed this basic principle of American federalism when it stated in a related context: "Punitive damages have long been a part of traditional principles of state law. As noted above, Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted." *Silkwood v. Kerr-McGee Corp.,* — U.S. —, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984).

A related interest that has been suggested to justify the exercise of federal judicial power in this case is the federal court's own interest in "doing justice." It could be

---

17. Various proposals have been presented to the Congress concerning the widespread problems arising from the massive exposure to asbestos. *See* Product Liability Act, S. 44, 98th Cong., 1st Sess. (1983); Occupational Disease Compensation Act of 1983, H.R. 3175, 98th Cong., 1st Sess. (1983); Asbestos Workers Recovery Act of 1984, S. 2708, 98th Cong., 2d Sess. (1984). To date, though, none of these has been enacted into law. Congress has recently, however, amended the Longshoremen's and Harbor Workers' Compensation Act with respect to claims related to occupational diseases, including those resulting from the exposure to asbestos. *See* Longshore and Harbor Workers' Compensation Act of 1984, Pub.L. No. 98–426, 98 Stat. 1639.

argued that federal courts have an institutional interest in maintaining a federal judicial system that is fundamentally "just." While we are sympathetic to such an argument, it is clear that such an abstract, all-encompassing interest cannot form a sufficient basis upon which to rest the displacement of state law. First, we find implicit in *Erie* the idea that in diversity actions federal court concerns in a just judicial system cannot be used as a reason for supplanting substantive state policies. Second, certainly as a practical matter, the effect of resting assertions of federal judicial power on so vague an interest as "justice" would be to eviscerate *Erie* completely and thus ignore its constitutional underpinnings. Third, the Supreme Court itself has already rejected a similar interest in *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). In that diversity case, the plaintiff argued, *inter alia*, that the federal court's equitable powers and discretion constituted an exception to *Erie* and that, therefore, the federal court was not bound by the state statute of limitations. The Supreme Court, in rejecting the plaintiff's claim, stated:

> But since a federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.

*Id.* at 108–09, 65 S.Ct. at 1469. A federal court's interest in "doing equity" is closely related to its interest in "doing justice." It is doubtful that the Supreme Court in *Guaranty Trust* would have been any more willing to displace state law if the plaintiff additionally had successfully shown that the applicable state statute of limitations was "unjust." Obviously, if justice could be used as a justification for the naked exercise of federal judicial power, the Supreme Court's oft-repeated assertion that the instances in which federal common law governs are "few and restricted" would no longer be true. *Cf. Texas Industries, Inc., supra*, at 640, 101 S.Ct. at 2066 (denying rights of contribution against antitrust co-conspirators).

Finally, we note the impracticalities of fashioning a federal common law in the context of asbestos litigation. First, any decision by this court to displace state law would be effective only within our geographical jurisdiction. While it is of course possible that other circuits would in time follow our lead, at least one circuit has already expressly refused to apply federal common law in these circumstances. *See Moran, supra*, at 817 ("relief sought ... may be more properly granted by the state or federal legislature than by this Court"). Unless and until the Supreme Court imposes a similar federal common law on the country as a whole, any federal substantive rules fashioned by us would only exacerbate the alleged inequities among claimants, with punitive and certain types of compensatory damages being available outside the circuit but not within. Such a result, in turn, would encourage a massive effort at forum shopping to bring suits outside this circuit.

Second, we are unable to discern any governing principle of easy application for the imposition of federal common law in the asbestos context. Although the amount of recovery available to plaintiffs depends in large part on the availability of punitive damages and the scope of the actionable injury, many other aspects of the litigation similarly play a significant role in determining the size of potential awards. The applicable limitations period for the bringing of an action, for example, has a direct impact on aggregate recovery and thus the availability of funds for future claimants. The simple fact is that, once the need to limit plaintiffs' recoveries is used to justify the creation of federal substantive rules precluding the recovery of punitive damages and narrowing the scope of the actionable injury, there would be no principled means of restricting the application of federal common law to other matters, either in the context of asbestos litigation or in relation to similar legal problems.

As a consequence, federal courts would become increasingly responsible for establishing a general federal tort law in a manner we think is inconsistent with the teachings of *Erie* and the logic behind our federal system. *Cf. Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981) (due process clause not intended to be "a font of tort law to be superimposed upon whatever systems may already be administered by the States") (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)).

Third, displacement of state law in asbestos cases would require federal courts to reexamine the major issues and principles involved in asbestos litigation, most of which are presently settled under state tort law. As a result, the progress of currently pending asbestos cases through the federal court system would come to a virtual standstill. The need to ensure quick resolution of the claims militates strongly against taking such action.

■ In sum, we find that this case is not an appropriate one for the creation of a federal common law because of the absence of a uniquely federal interest and the practical problems that would attend the displacement of state law. Although federal common law may at times be a "necessary expedient," *Milwaukee II, supra,* at 314, 101 S.Ct. at 1791 (quoting *Committee for Consideration of Jones Falls Sewage System v. Train,* 539 F.2d 1006, 1008 (4th Cir.1976) (en banc)), under our federal system Congress is generally the body responsible for balancing competing interests and setting national policy. There is no doubt that a desperate need exists for federal legislation in the field of asbestos litigation. Congress' silence on the matter, however, hardly authorizes the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions. Displacement of state law is primarily a decision for Congress, and Congress has yet to act. *See Miree, supra,* at 32, 97 S.Ct. at 2495.[18]

3. *Certification.*

It remains for us to consider under Mississippi law the nature of the actionable injury and the availability of punitive damages in the asbestos context. Upon review of the relevant caselaw and the briefs of counsel, we find that these issues are currently unresolved under Mississippi jurisprudence and are appropriate for certification to the Mississippi Supreme Court pursuant to Mississippi Supreme Court Rule 46.[19]

As noted above, resolution of whether the district court erred in allowing Jackson to recover damages associated with the manifestation of cancer as a probable future consequence or for mental anguish resulting from his increased risk of cancer may depend under current Mississippi doctrine upon the nature of the actionable injury. This is so because asbestosis itself

18. Because we find that the imposition of federal common law is clearly not appropriate in this context, we have determined not to certify the question to the United States Supreme Court pursuant to 28 U.S.C. § 1254(3), as suggested by the dissent. *See Wisniewski v. United States,* 353 U.S. 901, 902, 77 S.Ct. 633, 634, 1 L.Ed.2d 658 (1957) (per curiam) (certification only proper in rare instance when advisable in the proper administration and expedition of judicial business); *United States v. Perrin,* 131 U.S. 55, 58, 9 S.Ct. 681, 682, 33 L.Ed. 88 (1889) (question certified must pose "a real question of a difficult point of law"). *See generally* 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4038.

19. Mississippi Supreme Court Rule 46 provides:
When it appears to the Supreme Court of the United States, or to any circuit court of appeals of the United States, that there are involved in any proceedings before it questions or propositions of law of this state which are determinative of said cause independently of any other questions involved in said case and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court before rendering a decision may certify such questions or propositions of law of this state to the Supreme Court of Mississippi.
*Government Employees Ins. Co. v. Brown,* 446 So.2d 1002, 1002 n. 1 (Miss.1984).
Texas law which governed our decision in *Hansen v. Johns-Manville Prod. Corp.,* 734 F.2d 1036 (5th Cir.1984), provided no procedure to certify a question to that state's highest court.

does not lead to an increased risk of cancer and under Mississippi law plaintiffs can only recover for mental suffering or probable future consequences that at the very least are the direct result of the actionable wrong. *See, e.g., Sears, Roebuck & Co., supra,* at 901. Mississippi courts, however, have yet to consider how abstractly to characterize the wrong involved in the latent disease and mass tort context, and we are reluctant to undertake the careful weighing of competing state policies that such a determination would entail. On the one hand, characterizing the injury as being the initial exposure might provide the plaintiff the traditional right under Mississippi law to recover in a single action present damages, damages for mental anguish, and those future damages resulting from defendants' wrongful act that can be established in terms of reasonable probabilities. *See, e.g., Entex, Inc., supra,* at 1104. Substantial awards for mental anguish or for prospective damages, on the other hand, might jeopardize, especially with respect to mass torts, the viability of the enterprises that are to accomplish the strict liability goal of loss distribution.[20] Be-

cause of the potential complexity of the policy analysis required here, certification is needed to reach a principled rather than a conjectural result. *See State of Fla. ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 275 (5th Cir.), *cert. denied,* 425 U.S. 930, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976); *see also,* Brown, *Certification—Federalism in Action,* 7 Cumberland L.Rev. 455 (1977).[21]

█ In regard to the availability of punitive damages, a similar problem exists. Although punitive damages are generally available if the defendants have engaged in "wanton, gross or intentional conduct in the nature of an independent tort," *State Farm Mutual Automobile Co. v. Roberts,* 379 So.2d 321, 322 (Miss.1980), a plaintiff has no absolute right under Mississippi law to punitive damages. Mississippi courts are clearly able to consider policy in determining in a given case whether punitive damages are appropriate at all or whether a particular award is excessive. *See T.C.L., Inc. v. Lacoste,* 431 So.2d 918 (Miss. 1983); *Tideway Oil Programs, Inc. v. Serio,* 431 So.2d 454, 460 n. 1 (Miss.1983).

---

20. Contrary to the defendants' contention and the panel opinion, Mississippi statute of limitations cases describing under what circumstances specific limitations periods begin to run do not necessarily provide a ready answer to this problem. In a statute of limitations case, a court must balance the plaintiff's need to obtain at least adequate compensation with the defendant's need to be secure against stale claims and to plan for the future without the uncertainty of potential liability. *Wilson v. Johns-Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir.1982). The plaintiff in the statute of limitations context desires his action to be construed as accruing at the manifestation of the disease. Here, however, the parties clearly have different respective interests. Jackson, for instance, is arguing that the actionable harm was the asbestos exposure, not the manifestation of the disease. As the District of Columbia Circuit Court of Appeals observed in *Wilson, supra,* at 118 & n. 36, there is no reason to think that the dimensions of a claim are inevitably identical for all purposes. Statutes of limitations, as well as definitions of actionable injuries, " 'find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles.' " *Id.* at 118 (quoting *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945)).

21. While we think that under current law the availability of mental anguish damages and damages for cancer as a probable future consequence depends upon a common issue of law, we certify both questions to the Mississippi Supreme Court. We fully recognize the possibility that the Mississippi Supreme Court may determine that, regardless of the nature of the actionable injury, in the mass tort context one type of damages should be recoverable but not the other. We further note that the Supreme Court of Mississippi, of course, will not be bound in any way by the perimeters of the certified questions. We have often stated:

   [T]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.

   *Martinez v. Rodriguez,* 394 F.2d 156, 159 n. 6 (5th Cir.1968).

We have found no case in which the Mississippi Supreme Court has considered the availability of punitive damages in a mass tort context such as the one presented here. Thus, in light of the growing controversy that has in recent years surrounded the availability of punitive damages in such contexts,[22] we think it is in the interests of the best administration of justice to allow the Mississippi Supreme Court the opportunity to weigh the competing interests at stake and to declare authoritatively Mississippi policy on this issue. *See Barnes v. Atlantic & Pacific Life Insurance Co.,* 514 F.2d 704, 706 (5th Cir.1975) ("When the state law is in doubt especially on the underlying public policy aims, it is in the best administration of justice to afford the litigants a consistent final judicial resolution by utilizing the certification procedure.").

Although we have determined to certify these issues, we first, as is our usual practice, request the parties to submit a joint statement of facts and stipulated questions to be certified to the Mississippi Supreme Court. Following receipt of a response, we will transmit the formal certificate as well as the record in the case and copies of the parties' briefs, including any briefs submitted in response to our inquiry herein.

CERTIFIED.

ALVIN B. RUBIN, Circuit Judge, concurring.

Although I think that diversity cases should not be reheard en banc,[1] I concur in this opinion because we are remanding the case to obtain the opinion of the state Supreme Court, which alone can furnish us an authoritative state-law decision on issues involved in hundreds of cases pending in the federal district courts.

CLARK, Chief Judge, with whom GEE, GARZA, POLITZ and E. GRADY JOLLY, Circuit Judges, join, dissenting.

The nub of the disagreement with the majority opinion lies in its essential premise that justice is too abstract, too all-encompassing a concept to serve as a basis for supplanting state substantive law in diversity cases. Therefore, the aim of this dissent will be to develop the values that support the premise that existing precedent creates a duty to ask the Supreme Court of the United States to instruct us on whether federal common law should be applied in this litigation.

The majority labels this a "Mississippi diversity case." While this is literally accurate, it is misleading. *Jackson* is a seminal case that will control the rights of untold thousands of litigants in this court. The panel opinion cannot form a proper premise for dissent, for, like the majority, it too gave less than adequate consideration to the impact of the unprecedented volume of the asbestos litigation in the federal court system. The number of the claims is already legion and increasing at a geometric rate. Compensation for these actions, most of which are founded on the concept of liability without fault, must be paid by a finite and indeed limited group of business entities and insurers. These facts prevent consideration of James Leroy Jackson's case in isolation. They also preclude our dealing with Jackson and his cohorts as a group of litigants whose cases should be governed by Mississippi law under ordinary diversity principles. The only just resolution this court can achieve here is to certify to the United States Supreme Court under 28 U.S.C. § 1254(3) the question of whether

---

**22.** *See, e.g.,* Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257 (1976); Seltzer, *supra* note 15; Comment, *Mass Liability and Punitive Damages Overkill,* 30 Hastings L.J. 1797 (1979); Comment, *Punitive Damages, the Common Question Class Action, and the Concept of Overkill,* 13 Pac.L.J. 1273 (1982); Szuch & Shelly, *Time to Eliminate Punitive Damages,* Nat'l L.J., Feb. 28, 1983, at 13, col. 1. *See also Roginsky v. Richardson Merrell, Inc.,* 378 F.2d 832, 838–41 (2d Cir.1967) (describing problems

with awarding punitive damages in mass tort context).

**1.** *See Sturgeon v. Strachan Shipping Co.,* 731 F.2d 255, 260 (5th Cir.1984) (en banc) (Rubin, J., dissenting); *Edwards Co. v. Monogram Indus., Inc.,* 730 F.2d 977, 987 (5th Cir.1984) (en banc) (Rubin, J., concurring); *cf. Nash v. Estelle,* 597 F.2d 513, 534 (5th Cir.1979) (en banc) (Rubin, J., dissenting).

federal common law must be developed to govern this uniquely interdependent mass of tort litigation.

## I

In the fifteen years since the filing of the first suits, the field of asbestos litigation has exploded.[1] We are confronted with an already astronomical and still growing number of plaintiffs seeking individual recoveries against a finite pool of assets belonging to a relatively small group of defendants. Because the insidious diseases giving rise to these claims have latency periods ranging up to forty years, the injuries of many plaintiffs will not become manifest for years to come. There is a real and present danger that the available assets will be exhausted before those later victims can seek the compensation to which they are entitled.[2] This threat is exacerbated by inconsistent state policies pertaining to many elements of litigation. The clearest sources of this danger are the two major concepts at issue here: the availability of punitive damages and the propriety of restricting the accrual of each of the many distinct diseases that can result from asbestos exposure to the actual date of manifestation. In this unique context, the continued case-by-case implementation of these policies on an inconsistent basis will permit initial plaintiffs, through disproportionate awards, to consume the only assets available to compensate later-filing but equally deserving plaintiffs.

Each of the many states touched by this litigation has a strong interest in ensuring that its citizens receive full compensation, regardless of when their individual claims accrue. Uncompensated victims could directly or indirectly burden the state itself.

However, no state can control the tort law of another. A state seeking to protect its own citizens can only shape its law to maximize the recovery of its own early plaintiffs, so that at least those individuals will not be impeded in the legal scramble for a share of insufficient assets.

We do not deal here with a question of limited scope and impact such as the application of a state statute of limitations governing breach of trust actions as did *Guaranty Trust*[3] on which the majority relies. As Justice Frankfurter pointed out, even before *Erie* such statutes generally governed diversity suits.[4] Rather, we confront a sequence of massive tort claims that has unparalleled geographic and financial dimensions. We confront cases where the application of divergent governing principles can destroy the rights of similarly situated claimants. We confront no less than a challenge to our purpose as courts.

## II

Just as the rote application of inconsistent state laws cannot resolve this problem, so too, any action by this inferior appellate court alone would be ineffective. Our creation of a federal common law to govern asbestos actions within the Fifth Circuit would only eliminate inequities among federal claimants in the area we serve. Courts outside our jurisdiction could continue to apply disparate policies. The question of resolving a proper federal common law rule must be certified to the Supreme Court of the United States—the only judicial forum capable of providing the right answer.

## III

Modern strict liability and, indeed, almost all tort principles are products of state law.

---

1. For the reader's convenience, factual information detailing the current volume of this litigation and its projected future impact has been placed in the Appendix.

2. The reality of this danger is emphasized by the fact that three asbestos companies including Johns-Manville, the dominant figure in the industry, have entered Chapter 11 bankruptcy proceedings. All have cited the projected liabilities from the products suits liability as their reason

for filing bankruptcy. *In re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bkrtcy.S.D.N.Y.1984); *In re Amatex Corp.*, 30 B.R. 309, 310 (Bkrtcy. E.D.Pa.1983); *In re U.N.R. Industries, Inc.*, 29 B.R. 741, 743 (N.D.Ill.1983).

3. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

4. *Id.* at 1470.

Since *Erie Railroad v. Tompkins* state law principles have governed diversity trials. This dissent invokes no departure from that well established rule. However, there is equally authentic authority that federal forums must impose an overarching rule to accomplish justice in litigation where the application of inconsistent rules generated by states with conflicting interests can consume the purpose of the state law itself.[5] Even in diversity cases we do not become courts of the states. That is why, with fidelity to the decision of the Supreme Court to apply state substantive law in diversity cases, it is necessary to remember that we always retain the duty to perform our tasks under our system of federalism.

The instances where the formulation of federal common law is justified are "few and restricted."[6] Federal common law only governs situations where "our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control."[7] Here the competing state interests presented by the nationwide flood of asbestos litigation place this case well within the second category as the interstate nature of the controversy makes the application of state law inappropriate.

## IV

The majority concludes that federal common law is available to resolve an interstate conflict only if the essential conflict is between the states as "discrete political entities." I respectfully disagree. This conclusion ignores Justice Burger's statement that the application of federal common law is not precluded in all matters involving only private citizens.[8] It is inconsistent with *Hinderlider v. La Plata River and Cherry Creek Ditch Co.,* 304 U.S. 92, 58 S.Ct. 803, 811, 82 L.Ed. 1202 (1938), the companion case to *Erie* in which Justice Brandeis announced the continuing vitality of federal common law under the proper circumstances.[9] *Hinderlider* itself was an action to enforce private rights of a Colorado corporation.

The basis for *Hinderlider* was an earlier water apportionment case, *Kansas v. Colorado,* 206 U.S. 46, 27 S.Ct. 655, 665–67, 51 L.Ed. 956 (1906). In *Kansas,* the Court ruled that an interstate dispute over the water in a nonnavigable stream was necessarily subject to federal common law because there was no viable means of resolving the conflict under state law. Therefore, the Court was obliged to formulate a body of federal common law to "settle that dispute in such a way as will recognize the equal rights of both and at the same time establish justice between them." *Id.* at 667.

Although both *Hinderlider* and *Kansas* specifically addressed the apportionment of water, their underlying rationale governs the equitable division of any scarce resource between citizens of different states where conflicting state interests make the use of either state's law inappropriate. The asbestos cases present this precise quandary. The finite pool of assets avail-

---

**5.** On the day Justice Brandeis wrote in *Erie Railroad Co. v. Tompkins,* "There is no federal *general* common law," 58 S.Ct. 817, 822 (1938) (emphasis added), in *Hinderlider v. La Plata River and Cherry Creek Ditch Co.,* 304 U.S. 92, 58 S.Ct. 803, 811, 82 L.Ed. 1202 (1938), another case between private parties, he also wrote: "whether the waters of an interstate stream must be apportioned between the two states is a question of 'federal common law' upon which neither the statutes nor the decisions of either state can be conclusive."

**6.** *Wheeldin v. Wheeler,* 373 U.S. 647, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963).

**7.** *Texas Industries, Inc. v. Radcliff Materials,* 451 U.S. 630, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981).

**8.** *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 2496, 53 L.Ed.2d 557 (1977) (Burger, C.J., concurring).

**9.** *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964).

able to satisfy an infinite number of claimants is an identical value to the limited water available to serve many riparian owners.

An equitable resolution of this nationwide competition for scarce assets is surely as important to the basic interests of federalism as the equities invoked to justify the formulation of a common law of nuisance to resolve the dispute between the several bordering states over the pollution of Lake Michigan.[10]

## V

Although certainly not presuming to tell the Supreme Court what course of action to take, it is appropriate, in seeking instructions, to say what divides us. We are not just divided on whether to reach for a single judicial resolution through Supreme Court certification, but also on whether that resolution should be left to state law. Our uncertainty is demonstrated by the conflict between the reasoning of the panel and the en banc majority on the substantive issues posed.

In capsule, the panel found punitive damages inappropriate in a mass tort context. Repeated awards of "smart money" for the same conduct do nothing to deter socially undesirable behavior. The enormous liability imposed by the compensatory awards in these cases has already achieved such deterrence. Aside from the inequity resulting from the fact that some states do not permit such awards, they carry the seeds to ultimately defeat the basic purpose of product liability law—to ensure that the manufacturers of a dangerous product, not the injured consumers, bear the costs of the injury. If punitive awards to early-filing plaintiffs exhaust the assets, late-comers or their state health and welfare programs must bear the costs of the injury.

These are values that no single-case application of any state's law can be expected to consider.

The panel opinion also explains that separate accrual dates for a cause of action for each of the diseases which may result from asbestos exposure is vital to ensuring a rational and equitable distribution of available assets. In some cases asbestos exposure does lead to cancer. Present experience indicates, however, that the majority of individuals exposed do not develop the disease. If a plaintiff who does not have asbestos-related cancer is allowed to recover for cancer damage because he finds a medical witness who will opine that there is a reasonable probability that he may later develop the disease, that individual's damage award will be a windfall if the disease never materializes. That windfall may leave later plaintiffs unable to secure compensation for diseases actually suffered. Without uniform rules to govern this accrual procedure courts cannot ensure that such assets as are available will be distributed to claimants in proportion to injuries suffered. Such claims must mature only as each disease is diagnosed so that each plaintiff may bring separate claims based on facts, not speculation, and receive proper compensation. Only a single source of authority can avoid the destruction of the rights of valid claimants by the application of inconsistent rules generated by forums with inconsistent and competing interests.

## VI

The majority says, and we agree, that legislation would be the preferred solution to the dilemma of providing an adequate scheme for the proper distribution of compensation. But Congress has failed to enact any of the asbestos compensation bills proposed to date.[11] Courts enjoy no com-

---

10. *Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 1393–94 & n. 6, 31 L.Ed.2d 712 (1972).

11. Asbestos Workers Recovery Act of 1984, S. 2708, 98th Cong., 2d Sess. (1984); Occupational Disease Compensation Act of 1983, H.R. 3175, 98th Cong. 1st Sess. (1983); Product Liability

Act, S. 44, 98th Cong., 1st Sess. (1983); Occupational Health Hazards Compensation Act, H.R. 5735, 97th Cong., 2d Sess. (1982); Asbestos Health Hazards Compensation Act, S 1643, 97th Cong., 1st Sess. (1981); Asbestos Health Hazards Compensation Act, H.R. 5224, 97th Cong., 1st Sess. (1981).

parable ability to refuse to decide cases brought before them. We must decide Jackson's claims. But it is not just Jackson's rights which are at stake. Literally, the rights of tens of thousands of claimants in cases presently being litigated depend on what we do. Untold thousands more who have not yet manifested the symptoms of the insidious diseases that can result from asbestos fibre inhalation also depend upon our decision. We cannot wait to see if the impasse in Congress ultimately will be broken by lawmaking.

The Supreme Court, as the only institution other than Congress capable of imposing the uniformity necessary to resolve this problem in a just manner, should be afforded the chance to deal with the singular problem presented by these cases. That Court has the power to formulate federal common law which will ensure equitable compensation for all claimants. Its ability to address the controlling issues with a single voice is not only necessary for just resolution of pending litigation; it is even more important to expeditious and equitable settlement of claims. A uniform set of rules would not only protect the rights of individual claimants and the effective functioning of the judicial system, but would also aid the efforts of the asbestos companies and their insurers to develop an effective procedure for resolving these disputes on a rational basis without resorting to the courts. The potential for disparate outcomes in the different states could encourage many plaintiffs to remain in the courts rather than resorting to a unified nationwide facility for resolving these disputes.[12]

Making judicial rules will not preclude legislative resolution. If Congress does decide to act in this area, federal common law declared by the courts would be preempted. However, the possibility of a future legislative solution does not justify a refusal by this court to deal properly with the cases now before us.[13]

Rather than infringing the perogatives of Congress, immediate unified judicial action would enhance the ability of Congress to address a recognized problem. All the asbestos compensation legislation proposed is premised on the assumption that asbestos manufacturers will provide most, if not all, of the necessary funding. This option will be foreclosed if these assets are exhausted prematurely by excessive awards to current plaintiffs. Moreover, the interests of individual states in protecting their claimants with later maturing disease will be facilitated and any unseemly conflict between state law rules will be eliminated.

## VII

Jackson's legal rights have been a long time maturing. However, the overriding importance of their proper development makes the minor delay in certifying these issues to the single forum that possesses the power to provide an effective remedy relatively insignificant. A Supreme Court decision not to answer the questions certified, or an answer that a federal common law rule should not be applied can be quickly given. Because of the importance of an affirmative substantive response to the myriad asbestos cases confronting the federal courts, any delay resulting from a certification procedure that would deal with the merits certainly would be worth the wait. The decision not to ask is an opportunity irretrievably lost.

Since the majority is unwilling to request instruction, it should not certify the issues proposed to the Supreme Court of Mississippi. This court's refusal to reconsider en banc its decision in *Hansen*,[14] the issuance of its mandate in that case before today's case was decided, coupled with loss of any chance to obtain uniform rules from the

---

12. *See* Appendix at 13 for a discussion of the alternative dispute resolution mechanisms proposed by the asbestos companies and their insurers.

13. *See Illinois v. City of Milwaukee*, 92 S.Ct. at 1395.

14. *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036, 1040–42 (5th Cir.1984) (declaring that Texas state law controlled the availability of punitive damages).

Supreme Court, eliminate any need to consider such certification. Despite the absence of clear controlling state court precedent as to whether punitive damages should be available in product liability actions and as to whether actions can mature for diseases before they are diagnosed, there can be no doubt that the Supreme Court of Mississippi would hold that Mississippi citizens should not be denied the right to claim punitive damages awards and to seek recovery for probable future diseases equal to the protections of law now accorded to citizens in other states. Any possibility that the Mississippi court would take the approach predicted in the panel opinion is gone.

### VIII

The matters discussed in this part are internal to this court and do not involve issues to be certified. Except for the following response to the majority's discussion of the application of Rule 403 to the trial courts' rulings on the admissibility of cancer evidence, the panel opinion sufficiently sets forth the reasons why we cannot concur in Part II A.

In Part II A.2 of its opinion the majority addresses the trial court's ruling admitting cancer evidence. Relevance, probity, and prejudice are dealt with separately as they relate to three issues: (1) the scope of a product liability defendant's duty to warn and test; (2) damages for mental anguish, and (3) damages due to cancer as a probable future consequence of asbestos exposure. Dealing with these issues as though they could be separated in result produces a tentative ruling that creates confusion without providing meaningful guidance to trial courts in terms of striking the Rule 403 balance. As we have explained above, the majority's indefinite suggestion is written in the sand. If the Mississippi Supreme Court answers either of the certified questions in the affirmative, they will moot the suggestion.

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . . ." The Ad-

visory Committee notes that certain circumstances in a case can call for the exclusion of evidence which is of unquestioned relevance. In explaining the balancing test required by the rule, they classify evidence which might induce a decision on a purely emotional basis as the most harmful. "Unfair prejudice" is expressly defined as an undue tendency to suggest a decision on an emotional basis. Finally, the Committee note requires that consideration be given to the probable lack of effectiveness of a limiting instruction and the availability of other means of proof.

This circuit en banc has considered the application of Rule 403 in a criminal case context, *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). There, we required courts to look at the "incremental probity" of the evidence in question in analyzing the offering party's need to make this form of proof and the tendency of the questioned evidence to invite an irrational decision.

Applying these standards, we believe that as to each individual issue, and collectively for this single trial, unfair prejudice—a decision based on emotion not reason—outweighs probity—the need for the evidence to prove Jackson's case.

As to the first issue—the scope of the defendant's duty to warn and test—proof that the inhalation of asbestos fibers can cause cancer is clearly relevant, but not the *sine qua non* of plaintiff's case. It has only incremental probity. He proved that inhalation of asbestos fibers has produced damaging, life threatening and life shortening consequence in his body. Conceding *arguendo* that the duty to warn or test could be heightened by the incremental difference in dangerousness of a product that caused only asbestosis as opposed to a product that could cause both asbestosis and cancer, the difference is one of slight degree. In the real world, the duty to warn and test would be substantially identical in either case. The other side of the problem—undue prejudice—flows from the fact that beyond doubt proof of cancer, a

dread disease because of its sequela and the lack of medical knowledge to control or cure it, is highly prejudicial and evokes the strongest of emotions. This prejudice must be coupled with the lack of effectiveness of any limiting instruction to eliminate the emotional reaction from the minds of the jury. Looking just at the first issue in Jackson's case, we submit that as a matter of law the 403 balance should be struck in favor of excluding cancer evidence. In any event, the balance ought not rise or fall with how many witnesses are used to prove the carcinogenic propensities of the product.

Moving to the majority's second element—the establishment of damages for mental anguish—we note at the outset that in the entire testimony of Jackson and his wife, the only witnesses who testified as to his mental state, neither consideration of an increased risk of contracting cancer nor the probability of contracting the disease was ever mentioned. Clearly, Jackson did not prove that he suffered any mental anguish because his work around and with asbestos had increased his risk of contracting cancer. While an increased risk of cancer could be critical proof where a plaintiff testifies to mental anguish based upon that hazard, Jackson established no need to prove that increased risk in this case.

The majority's final compartment—damages for cancer as a probable future consequence of Jackson's past injury—is one that in our view makes this whole discussion academic. If the reasons outlined in the panel opinion are accepted, Jackson's cause of action for that future prospect has not yet materialized. Rule 403 would say that he should be able to make that proof only when and if he contracts cancer. Alternatively, if, for the reasons set out above, the question of maturity of a cause of action for cancer is certified to the Supreme Court of the United States, any ruling on admissibility of cancer proof under Rule 403 must await that answer. If the federal common law (or Mississippi law under the majority's proposed certification) permits a present action for a potential disease, it will certainly change the other

weighings discussed. If cancer evidence is admitted for any purpose, it brings the hair of prejudice with the hide of probity for all purposes.

### IX

In sum, the asbestos-related litigation presents a flood of interrelated actions which cannot properly be decided as individual actions or under the legal rules of any single state. Unless the dependent rights of all present and future claimants are considered by the only forum capable of devising a single appropriate response to basic issues that affect the economic vitality of the compensation fund, disparate awards to early claimants can destroy the courts' ability to do justice. The asbestos litigation presents one of the few and restricted instances where formulation of federal common law is justified under the strictures defined by existing precedent. Given our statutory right to seek instructions from the Supreme Court, our duty is not done unless we ask. Certification to the Mississippi Court will only produce delay.

### X

We should certify the following questions to the Supreme Court of the United States under 28 U.S.C. § 1254(3):

1. Should federal common law limit or prohibit the award of punitive damages in litigation asserting strict liability or negligence rights against manufacturers and distributors of asbestos or products containing asbestos.

2. Should federal common law establish uniform rules for measuring the accrual of latent causes of action for separate diseases related to the manufacture and distribution of asbestos or products containing asbestos?

Because this court declines to so certify, we respectfully dissent.

### APPENDIX

### DIMENSIONS OF ASBESTOS LITIGATION

No other category of tort litigation has ever approached, either qualitatively or

quantitatively, the magnitude of the claims premised on asbestos exposure. By 1981, only eight years after the decision in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), it had become the largest area of product liability litigation, far surpassing the number of cases generated by the controversies over Agent Orange, the drug DES, the Dalkon Shield intrauterine device, or even automobile defects.[1] Between the early 1970's and 1982 the asbestos companies and their insurers expended over $1 billion in litigation expenses, damage awards and settlements.[2] This figure does not include the costs incurred by state or federal governments, expenses and compensation in workers' compensation claims, or the costs resulting from the Chapter 11 proceedings initiated by Johns-Manville, Unarco, and Amatex.[3]

## I. The Claimants

In August of 1982, approximately 21,000 claimants had filed product liability suits alleging asbestos-related injuries. Seven months later by March of 1983, the figure had risen to about 24,000 claimants.[4] Currently, new suits are being docketed at an average rate of 500 per month.[5]

### A

There is no single authoritative estimate of the number of asbestos claims that ultimately may be filed. Recognized experts have produced widely disparate figures. Inconsistencies are understandable. As-

bestos is pervasive throughout America. In the 1970's alone the country consumed between 608,000 and 876,000 short tons of asbestos a year.[6] The substance is used in over three thousand products commonly found in the home and work environments, including floor tiles, asbestos textiles, insulation, fireproof drapery, heat-resistant surfaces, acoustical ceilings, decorative building panels, and plaster or stucco.[7] Any exposure to this substance, even to a relatively minute amount, can precipitate the development of asbestos-related disease.[8] In particular, mesothelioma, an invariably fatal cancer, can result from extremely low exposure levels.[9] The long latency periods for asbestos-related disease, usually ranging between 15 and 40 years,[10] make it difficult to ever determine if all possible claimants exposed within a given time period have been identified. For example, many workers injured by asbestos exposure during World War II are only now filing claims.[11]

The problem is further complicated by the emergence of new and frequently unanticipated classes of plaintiffs. To date most cases have been filed by shipyard workers, asbestos product factory workers, and insulation workers. Now new groups of plaintiffs from different points along the line of distribution of asbestos are emerging. Potential claimants include warehouse workers, truck drivers, longshoremen, and spouses of workers exposed when

1. Nat'l L.J., Oct. 19, 1981, at 1, col. 1; *id.*, Aug. 18, 1980, at 1, col. 1.

2. Kakalik, Ebener, Felstiner, Haggstrom, & Shanley, *Variation in Asbestos Litigation Compensation and Expenses* v. (Institute for Civil Justice, Rand Corp. 1984) [hereinafter *Variation in Asbestos Litigation Compensation and Expenses*].

3. *Id.*

4. Kakalik, Ebener, Felstiner, Haggstrom, & Shanley, *Costs of Asbestos Litigation* 12 (Institute for Civil Justice, Rand Corp. 1984) [hereinafter *Costs of Asbestos Litigation*].

5. Asbestos Litig. Rep. (Andrews) 9,101 (Oct. 19, 1984); *see also* Special Project, *An Analysis of*

the Legal, Social, and Political Issues Raised by the Asbestos Litigation, 36 Vand.L.Rev. 573, 580–81 (1983).

6. Special Project, *supra*, note 5, 573, 578 n. 7, (citing to Asbestos Litig. Rep. (Andrews) 181–82 (Apr. 27, 1979)).

7. *Id.*

8. Selikoff, "Asbestos-Associated Disease," in *Asbestos Litigation* 21, 48 (W. Alcorn ed. 1982).

9. *Id.* at 36.

10. *Costs of Asbestos Litigation, supra* note 4, at 3.

11. *Id.*

the worker returned home covered with asbestos dust.[12]

Another growing area of potential suits arises out of asbestos use in the construction trade. The Environmental Protection Agency estimates that approximately 20% of commercial, residential, apartment, and federal buildings contain friable asbestos,[13]—asbestos in a form that can be reduced to powder by hand pressure, permitting the asbestos fibers to become dislodged and airborne.[14] Asbestos was used most heavily in construction during the 1960's,[15] until such use was restricted between 1973 and 1978. Most individuals exposed to asbestos in building construction and maintenance will not begin to manifest the symptoms of asbestos disease until after the majority of those exposed during shipbuilding operations have already died.[16] There are no firm estimates of the impact of asbestos materials on the occupants of buildings containing friable materials. However, Congress was sufficiently concerned about adverse health effects to mandate the removal of all friable asbestos from school buildings.[17] According to the U.S. Department of Education, at least 14,000 schools will be affected.[18]

B

Experts do not anticipate that the death rates from asbestos related diseases will begin to level off until after 1990.[19] Estimates of asbestos-related deaths also vary widely. The Rand Corporation, in the *Costs of Asbestos Litigation*,[20] a study prepared by its Institute for Social Justice, has summarized the results of the more prominent studies on this issue.

Dr. Irving Selikoff, in a 1981 study for the Department of Labor estimated that more than 21 million living American workers have been significantly exposed to asbestos during the past 40 years.[21] More conservative estimates have placed the number of individuals who experienced significant exposure at between eight and eleven million [22] or at over thirteen million.[23]

Dr. Selikoff anticipates 200,000 deaths before the year 2000 because of asbestos-associated diseases.[24] Paul MacAvoy of Yale University forecasts excess mortality due to asbestos through 2015 will range between 154,600 and 450,600, with the most probable estimate set at 265,000.[25] Johns-Manville anticipates only 18,700 excess me-

**12.** Selikoff, *supra* note 8.

**13.** *Asbestos in Buildings: A National Survey of Asbestos-Containing Friable Materials* 2-3 (Environmental Protection Agency 1984).

**14.** *Id.* at 1-1.

**15.** *Id.* at 7-20.

**16.** Washington Post, *Asbestos' Toll,* Sept. 17, 1984, at C 1, col. 1 (quoting Dr. William Nicholson, an expert on asbestos related diseases).

**17.** 20 U.S.C. § 3601(a)(3)(6). *See Report of the Attorney General on Asbestos Liability,* House Comm. on Education & Labor, 97th Cong., 1st Sess. (1982).

**18.** Asbestos Litig. Rep. (Andrews) 8,147 (April 20, 1984).

**19.** Special Project, *supra* note 5, at 580.

**20.** *Supra,* note 4, at 8-11.

**21.** *Costs of Asbestos Litigation, supra* note 4, at 9, (citing to I. Selikoff, *Disability Compensation for Asbestos-Associated Disease in the United*

States, Environmental Sciences Laboratory, Mt. Sinai School of Medicine of the City University of New York (1981)).

**22.** Special Project, *supra* note 5, at 580 n. 13 (citing National Cancer Institute and National Institute of Environmental Health Sciences, *Estimates of the Fraction of Cancer Incident in the United States Attributable to Occupational Factors* 1-2 (draft summary Sept. 11, 1978)).

**23.** *Occupational Health Hazards Compensation Act of 1982: Hearings before the Subcomm. on Labor Standards of the House Comm. on Education and Labor,* 97th Cong., 2d Sess. 132 (1982) (statement of Mr. Harvey Martens, executive vice president, Commercial Union Insurance Companies, Inc.) (cited in Special Project, *supra* note 5, at 580 n. 13).

**24.** *Costs of Asbestos Litigation, supra* note 4, at 9 (citing to Selikoff, *supra* note 22).

**25.** *Id.* at 10 (citing to MacAvoy *et al.* "The Economic Consequences of Asbestos-Related Disease," Yale University School of Organization and Management, Working Paper No. 27 (January 1982)).

sothelioma deaths and 55,120 excess lung cancer deaths through 2009.[26] These estimates chart only asbestos-related deaths, not disabilities.

### C

Not all individuals who were exposed to asbestos or even all of those who will die of asbestos-related diseases will actually bring suit. The Epidemiology Research Institute has estimated that Johns-Manville faces between 30,000 and 120,000 suits, with 45,000 set as the most probable number.[27] Paul MacAvoy has estimated that there will be over 200,000 new suits,[28] while Conning and Company has placed between 83,000 and 178,000 by the year 2010.[29] Despite substantial differences, all sources support the conclusion that asbestos producers and courts face an unprecedented number of claimants in the years to come.

As latent claims are developing over time, the likelihood that an injured party will go to court is increasing rapidly. Only 3% of the asbestos-related deaths between 1967–1968 resulted in law suits, but by 1975–76, this figure had risen to 32%.[30] In estimating the numbers of future suits, experts are assuming that by 1992 all asbestos-related deaths will result in litigation.[31] When this increasing propensity to sue is combined with mounting numbers of injured parties the burden on both producers and courts stemming from the asbestos litigation becomes staggering.

### II.  The Costs

### A

The most comprehensive studies of past costs are the two Rand Corporation reports referred to throughout this Appendix.[32] These studies calculate that the defendant asbestos companies and their insurers paid claimants and their lawyers approximately $400 million between 1970 and 1982. This figure encompasses trial awards, including punitive damages, and settlements.[33] In appraising the economic impact of this figure, the reader must be aware that in recent years jury verdicts have been demonstrating a pronounced upward trend.[34] Moreover, this does not include legal fees or litigation expense incurred by the producers themselves.

The average plaintiffs' verdict after a trial was $388,000.[35] The importance of limiting claims to those diseases actually diagnosed is demonstrated by these average jury verdicts: asbestosis—$205,000, lung cancer—$311,000, and mesothelioma—$469,000.[36]

The Asbestos Litigation Reporter determined that of the 147 asbestos cases tried a total of $39,468,002 in punitive damages had been awarded to 21 plaintiffs.[37] The Rand Study also addressed the issues of punitive damages. During the sample period chosen, January 1, 1980 to August 26, 1982, nineteen plaintiffs, 27% of those whose trials resulted in a jury verdict, received a total of $4,934,000 in punitive dam-

**26.** Walker, *Projections of Asbestos-Related Disease 1980–2009, Final Report,* (Epidemiology Resources, Inc. 1982) (cited in *Costs of Asbestos Litigation, supra* note 4, at 11).

**27.** *In re Johns-Manville Corp.,* 36 B.R. 743, 746 (Bkrtcy.S.D.N.Y.1984).

**28.** *Costs of Asbestos Litigation, supra* note 5, at 10, citing MacAvoy, *supra* note 20.

**29.** Conning & Company, *The Potential Impact of Asbestos on the Insurance Industry* (1982) (cited in *Variations in Asbestos Litigation Compensation and Expenses, supra* note 2, at 4).

**30.** *Costs of Asbestos Litigation, supra,* note 4, at 9.

**31.** *Id.* at 10 n. 14.

**32.** *Variation in Asbestos Costs and Litigation, supra,* note 2; *Costs of Asbestos Litigation, supra* note 4.

**33.** *Costs in Asbestos Litigation, supra* note 4, at 17.

**34.** N.Y. Times, January 10, 1983, D–2, col. 1 (cited in *In re Johns-Manville,* 36 B.R. at 746).

**35.** *Variation in Asbestos Litigation Compensation and Expenses, supra* note 2, at 21.

**36.** *Id.* at 30.

**37.** Special Project, *supra,* note 5, at 707 n. 853 (citing Asbestos Litig. Rep. (Andrews) 5663–71 (Oct. 8, 1982)).

ages. The awards, which ranged from $4,000 to $1 million, averaged $260,000 per plaintiff receiving punitive damages. If this amount was apportioned between all plaintiffs with jury verdicts, the net effect would be to raise each plaintiff's average compensation by $70,000.[38] These awards are not only becoming more numerous but also larger. By 1983, the number of punitive awards had risen to thirty.[39] Ten such awards, averaging $616,000, have now been returned against Manville alone.[40] The multiplication of these awards is demonstrated by a recent case in the Eastern District of Texas where a jury returned a punitive damage award of $1 million to each of the four plaintiffs.[41] This one verdict almost equals the awards given over the entire period studied by Rand.

The Rand study also demonstrated how a state with liberal laws governing punitive damages effectively can gain a disproportionate share of assets through these awards. Citizens of Pennsylvania, whose laws encourage punitive awards,[42] received two-thirds of the almost $5 million awarded during the eighteen month period studied.[43] While only 14% of the plaintiffs nationwide whose trials began in the relevant period received punitive awards,[44] 34% of the Pennsylvania plaintiffs in this group were given punitive damages.[45]

### B

The ultimate punitive liability which confronts the asbestos companies cannot be predicted reliably. Many studies have esti-

mated the total liability confronting the industries and its insurers. Their estimates vary as widely as those attempting to predict the number of future deaths or law suits. The Rand study describes the results of three such studies. Paul MacAvoy anticipates a future compensation liability between $8 billion and $87 billion, with $38 billion as the most likely sum.[46] Conning and Company has placed future liability for the insurance industry arising from asbestos exposure within the range of $4 billion to $10 billion.[47] Manville Corporation, in its Chapter 11 proceedings, has estimated its own future liability at a minimum of $2 billion,[48] but the presiding bankruptcy judge has observed that there are many indications that this figure is too conservative.[49] The New York Academy of Science has estimated the social costs of the death and disability resulting from asbestos exposure at between $39 billion and $74 billion over the next 25 years.[50]

It is unclear whether these figures encompass liability arising from the use of asbestos in buildings. At present, removal of this material is mandatory only in schools. A recent study by the U.S. Department of Education estimates this involves some 14,000 schools and that removal costs will reach $1.4 billion.[51] At least forty school districts have filed suit against the asbestos companies to obtain compensation for the removal of the asbestos. Many of these suits are also seeking millions of dollars in punitive awards.[52]

38. *Id.* at 50.

39. Brownstein, *Asbestos Litigation: A Legal Nightmare That Congress is Being Asked to End,* 15 Nat'l J. 1942, 1946 (1983).

40. *In re Johns-Manville,* 36 B.R. at 746.

41. Asbestos Litig. Rep. 9,169 (Andrews) (Nov. 2, 1984).

42. Surrick, *Punitive Damages and Asbestos Litigation in Pennsylvania: Punishment or Annihilation,* 87 Dick.L.Rev. 265, 280–83 (1983).

43. *Variations in Asbestos Litigation Compensation and Expenses, supra* note 2, at 71.

44. *Id.* at 50.

45. *Id.* at 71.

46. *Costs of Asbestos Litigation, supra* note 5, at 10.

47. *Id.*

48. *In re Johns-Manville,* 36 B.R. at 746.

49. *Id.*

50. Special Project, *supra* note 4, at 581 n. 21.

51. Asbestos Litig. Rep. (Andrews) 8,147 (April 20, 1984).

52. Asbestos Litig. Rep. (Andrews) 9,253 (Nov. 16, 1984).

## III. The Defendants

This liability confronts a relatively small group of asbestos companies and their insurers. On the average, twenty defendants are named in each suit. Although more than three hundred different corporations have been sued, liability is actually focused on a very small group. Sixteen corporations are named in at least half of all the suits. Another group of fifteen are in one-quarter to one-half of the suits.[53] Accordingly, the bulk of the 300 defendants play a minimal role in the overall amount of litigation.

Most asbestos producers claim to be covered by insurance for part or all of their exposure. About fifty insurers have some involvement, but only about twelve can be characterized as deeply involved in this controversy.[54] The likely number of asbestos claims ultimately covered by insurance is uncertain in light of the widespread ongoing litigation over the coverage provided by the policies in question.[55]

No available assessment totals the combined assets of the asbestos defendants and their insurance companies. However, the Commercial Union Insurance Company, in their amicus curiae brief supporting a petition for certiorari in *Insurance Company of North America v. Keene Corp.*, has estimated that the net worth of the insurance companies involved to be $9.7 billion and that of the asbestos companies as $25.6 billion, for a combined total of $35.3 billion.[56] This is less than most of the liability estimates described in Part II B. Manville, the largest of the producers has an estimated net worth of only $1 billion dollars.[57]

## IV. The Courts

Asbestos-related litigation is proceeding in at least forty-eight states. The largest proportion of the cases filed to date is found in those states where the shipbuilding industry is centered. On a national basis, slightly more than half of the claims closed by August of 1982 were filed in federal court. In two of the five states generating the most litigation, New Jersey and Texas, over 90% of the closed claims were brought in federal court, while in California and Pennsylvania, also within that group, over two-thirds of the closed claims were filed in state courts. All federal courts together have tried about 10% more suits than state courts.[58] According to the Administrative Office of the Courts, as of June 30, 1980 the asbestos cases were divided among the district courts in each circuit as follows:[59]

5th Circuit—39%
1st Circuit—24%
2d  Circuit—8%
4th Circuit—8%
3d  Circuit—7%
6th Circuit—4%
9th Circuit—3%
11th Circuit—3%
7th Circuit—2%

Less than 1% of the cases are pending within the 8th, 10th, and D.C. Circuits.

## V. An Industry Response

The asbestos producers and their insurance companies, under the guidance of Dean Wellington of Yale Law School recently have agreed to establish an Asbestos Claims Facility designed to settle claims arising from asbestos injuries. The Facility, would be a national institution to evaluate the existence and extent of asbestos-related physical impairment for each claimant. It would also assess the liability of those companies belonging to the Facility,

**53.** *Costs of Asbestos Litigation, supra* note 4, at 12.

**54.** *Id.*

**55.** *See* Special Project, *supra* note 4, at 709–73.

**56.** Asbestos Litig. Rep. (Andrews) 4364, 4367–69 (Jan. 8, 1982).

**57.** Afelli, *Management by Bankruptcy,* Fortune 69, 69 (Oct. 31, 1983).

**58.** *Costs of Asbestos Litigation, supra* note 4, at 10.

**59.** Letter from David Cook of the Administrative Office of the United States Courts to Judge Charles Clark (Sept. 4, 1984).

and consider any applicable defenses and setoffs. The terms of the agreement establishing the Facility also provide for the member insurance companies to reimburse the asbestos companies for claims paid according to a prescribed formula.[60]

**60.** *Asbestos Claims Facility Goes Public: Wellington Negotiations Succeed in Round One,* 2 Alternatives to the High Cost of Litigation 2–5 (1984).