Clarence J. WILSON

v.

JOHNS–MANVILLE SALES CORPORATION, Fibreboard Corporation, Armstrong World Industries, Inc., Celotex Corporation, Combustion Engineering, Inc., Eagle-Picher Industries, Inc., Owens-Corning Fiberglas Corporation, Pittsburgh Corning Corp., Ruberoid Co., A Division of GAF Corp., Unarco Industries, Inc., Owens-Illinois, Inc., Forty-Eight Insulations, Inc., Raybestos Manhattan Corp., Keene Corporation, Standard Asbestos MFG and Insulating Company.

No. Civ. A. G–81–168.

United States District Court,
S.D. Texas,
Galveston Division.

July 9, 1985.

Robert Ballard, Lawrence Madeksho, Jane Frazier, Kronzer, Abraham, Watkins, Nichols, Ballard & Friend, Houston, Tex., for plaintiff.

Craig Clendenin, Lyn Stevens, Weller, Wheelus & Green, Beaumont, Tex., for Fibreboard Corp.

John H. Boswell, David Carlson, Hallmark & Boswell, Houston, Tex., for Armstrong World Industries.

Gail Jenkins, David Groves, Lipscomb Norvell, Benckenstein, Norvell & Bernsen, Beaumont, Tex., for Celotex Corp.

Frank Bean, Andrew McKinney, Bean & Manning, Houston, Tex., for Eagle-Picher Industries, Inc.

Samuel E. Stubbs, James Crosby, Fulbright & Jaworski, Houston, Tex., for Owens-Corning Fiberglas.

Ronald E. Cook, Mayor, Day & Caldwell, Houston, Tex., for Pittsburgh Corning Corp.

Art Stamm, Richard L. Josephson, John Sullivan, Baker & Botts, Houston, Tex., for Owens-Illinois, Inc.

Larry Knapp, Wyckoff, Russell, Dunn & Frazier, Houston, Tex., for Forty-Eight Insulations, Inc.

Elizabeth Thomas, Jeff McClure, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for Raybestos-Manhattan Corp.

Sandra F. Clark, Gene M. Williams, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for Standard Insulations, Inc.

## MEMORANDUM

HUGH GIBSON, District Judge.

This Court recently concluded a seventeen-day trial in which the suits of fifty asbestos claimants were joined together for a single trial on the bifurcated issues of liability and punitive damages. In this memorandum, the Court explains its reasons for implementing this novel approach to asbestos litigation.

Litigation premised on asbestos exposure is by far the largest area of products liability litigation in the United States today. *Jackson v. Johns-Manville Sales Corp.,* 750 F.2d 1314, 1336 app. (5th Cir.1985). As of March 1983, there were more than 24,000 asbestos claims pending, with new suits being filed at an average rate of 500 per month. *Id.* Although there is no authoritative estimate for the number of asbestos claims that ultimately may be filed, it is certain that courts can expect a staggering number of claims in the years to come. *Id.*

The magnitude of asbestos litigation is of particular concern to this Court, which has more than 150 asbestos cases pending on its 750 case docket. Because of the extensive number of claims pending and the lengthy nature of an asbestos trial, this Court is currently unable to afford each asbestos plaintiff an individual trial. As a consequence, allegedly injured parties are being denied their day in court while their claims grow older and the backlog of asbestos cases grows. This state of affairs is entirely unacceptable to the Court. The Court must accordingly devise an innovative and efficient procedure for the timely resolution of asbestos claims. The procedure should, to the fullest extent possible, achieve both fairness to the parties and judicial economy.

The Court has learned through trial experience that an asbestos trial may be viewed as being comprised of two distinct

phases. The so-called first phase involves the issue of product defectiveness. In this phase, the plaintiff seeks to establish that the defendants' asbestos containing products were defective as marketed and unreasonably dangerous because of the manufacturer's failure to provide an adequate warning. Because under Texas law a manufacturer's duty to warn is limited to those dangers which are foreseeable, *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1088 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), the plaintiff is compelled to introduce evidence establishing that the defendants knew, or should have known, that insulators and other end-product users, such as most of the asbestos plaintiffs before this court, were at risk from exposure to asbestos containing products. In order to meet this burden the plaintiff will introduce state of the art evidence. This evidence consists of an historical survey of the scientific and medical literature regarding the health hazards posed by asbestos and the opinions of the plaintiffs' and defendants' expert witnesses as to what knowledge or notice this literature did or did not impart to the asbestos manufacturers during the relevant time periods.

Related to the issue of product defectiveness is the issue of punitive damages. In seeking to prove an entitlement to punitive damages, the plaintiff argues that the state of the art evidence establishes that the defendant manufacturers knew that insulators and other end-product users were at substantial risk from exposure to asbestos products. The manufacturers' marketing of their asbestos products without adequate warnings despite this knowledge thus constituted callous and reckless conduct in disregard to the insulators' welfare and safety.

It has been the Court's experience that the presentation of the state of the art evidence, offered for the issues of product defectiveness and punitive damages, has become standardized in that it differs little from trial to trial and is not specifically tailored to a particular plaintiff's case. The Court has further learned that the state of the art phase of an asbestos trial constitutes an appreciable portion of the total trial time.

The so-called second phase of an asbestos trial concerns the issues of exposure, causation, injury and compensatory damages. Unlike the first phase of the trial where the state of the art evidence is introduced, this portion of the trial involves distinct factual issues peculiar to each particular plaintiff.

Rule 42(a) of the Fed.R.Civ.P. permits the court to order consolidation and a single trial of different cases on the court's docket, or of issues within those cases, when the cases involve a common question of law or fact. The purpose of Rule 42(a) is to grant trial courts broad discretion to manage their dockets efficiently while providing justice to the parties. 9 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2381 at 253 (1971). Because the issues of product defectiveness and punitive damages are questions of fact common to all of the court's pending asbestos cases, the Court concludes that consolidation, for the resolution of the product defectiveness and punitive damages issues, is appropriate for the Court's pending asbestos cases.

Rather than consolidating all of the Court's more than 150 asbestos cases, however, the Court concludes, for administrative reasons, that the initial consolidated trial shall be comprised of 50 cases. Consolidation of 50 cases for a single trial on the issues of product defectiveness and punitive damages will promote judicial economy and fairness to the litigants in several important respects. The consolidation will finally enable many asbestos claimants, heretofore denied their day in court because of the backlog of asbestos cases, to present their allegations of product defectiveness to a jury. Consolidation will also significantly conserve judicial resources. Whereas without the consolidation the same lengthy state of the art evidence would have to be repeated in 50 separate trials, consolidation allows the common factual questions of product defectiveness and

punitive damages to be fully and fairly presented in a single trial. Lastly, consolidation will save the defendant manufacturers considerable inconvenience and expense. Because the same 8 to 12 manufacturers are usually named as defendants in each asbestos lawsuit, the Court's consolidation will save these defendants the expense of litigating the issues of product defectiveness and punitive damages in 50 separate trials.

■ If the plaintiffs prevail on the issue of product defectiveness at the consolidated trial, the Court will then need to address all remaining issues in the 50 individual cases which had comprised the consolidated trial. The issues remaining for resolution would be those of exposure, causation, injury and compensatory damages. As previously mentioned, these issues, unlike the issues of product defectiveness and punitive damages, involve distinct factual questions peculiar to each particular plaintiff and are thus not amenable to resolution in a single consolidated trial. The individualistic nature of these issues, however, does not preclude the Court from implementing a procedure to efficiently and fairly resolve all remaining issues in these 50 cases. Accordingly, the Court concludes that rather than conducting 50 individual trials, the residual issues of exposure, causation, injury and compensatory damages will be resolved by trying the cases in groups of five.

It has been the Court's experience that a jury can adequately comprehend and differentiate the evidence when 5 asbestos cases are joined together for trial.[1] The Court expects to be able to efficiently try the groups of 5 cases because the lengthy state of the art evidence, fully presented at the consolidated trial on the issues of product defectiveness and punitive damages, need not be repeated. Since a period of six months or more may be required to conduct the consolidated trial on the issue of

product defectiveness and all of the residual trials of 5 cases each, the Court proposes to use separate juries for the consolidated trial and each of the residual trials. The court's submission of the separate and distinct issues to separate juries will not violate the parties seventh amendment right to a jury trial. *Martin v. Bell Helicopter Co.*, 85 F.R.D. 654 (D.Colo.1980); 9 C. Wright & A. Miller, *supra*, § 2391 at 302–303.

■ The efficiency and utility of the foregoing procedure—the resolution of 50 pending asbestos cases by conducting a single consolidated trial on the issues of product defectiveness and punitive damages, followed by short trials of 5 cases each on the residual issues of exposure, causation, injury and compensatory damages—derives from the fact that two factual questions common to 50 pending asbestos cases can be fairly and efficiently resolved in one proceeding through a single presentation of the lengthy state of the art evidence. The defendants contend, inter alia, however, that the court may not properly implement this procedure because Texas law requires that the issues of punitive and compensatory damages be submitted at the same proceeding. If the defendants' contention is correct, the Court would be compelled to submit the punitive damages issue at each residual trial. This would require the repetition of the lengthy state of the art evidence in each of the ten residual trials, thus thwarting the court's attempt to achieve fairness and efficiency. Upon a review of the Texas law on punitive damages, however, the Court is convinced that the issue of punitive damages may properly be presented at the consolidated trial even though the issue of compensatory damages will not be addressed until a later trial before a different jury.

When reviewing the reasonableness of an award of punitive damages upon appeal, Texas law provides that "the amount of

---

1. On three occasions during the past year and a half the Court has successfully joined together the cases of 5 asbestos claimants for trial. The Court has found that this procedure significant-ly conserves the resources of both the Court and the litigants. In each of these cases, as in the instant case, the same counsel represented all plaintiffs.

exemplary damages should be reasonably proportioned to the actual damages found." *See e.g. Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1377 (5th Cir.1982); *Southwestern Inv. Co. v. Neeley,* 452 S.W.2d 705, 707 (Tex.1970). While the relationship between exemplary and actual damages should be proportional, no set rule, ratio or formula exists which will be considered reasonable in any given case. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). The reasonableness of an award of punitive damages must instead be decided upon the facts of each particular case. *Id.* Since no precise ratio is ever required, the proportionality rule is really not a rule at all, but only a general standard or guideline. D. Dobbs, *Remedies* § 3.9 at 211 (1973). For example, Texas appellate courts have found a jury's award of punitive damages to be reasonable when the ratio of exemplary damages to actual damages has been 20 to 1, *Alamo Nat'l. Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981); 12.5 to 1, *K-Mart Corp. Store No. 7441 v. Trotti,* 677 S.W.2d 632 (Tex.Civ.App.—Houston, 1984, writ ref'd n.r.e.); 5 to 1, *Houston Lighting & Power Co. v. Sue,* 644 S.W.2d 835 (Tex.Civ. App.—Corpus Christi, 1982, writ ref'd n.r. e.); and 2.5 to 1, *Ogden v. Wilson,* 649 S.W.2d 780 (Tex.Civ.App.—Austin, 1983, writ ref'd n.r.e.). Because the Texas proportionality rule is merely a general guideline to be used upon review and in no way effects the jury's determination of the punitive damages award at trial, the Court is of the opinion that the rule does not preclude the court from submitting the punitive damages issue at the consolidated trial in the absence of any submission concerning actual damages.

In fact, the Court is of the opinion that the independent submission of the punitive damages issue at a consolidated trial may be the preferrable method. Because the purpose of punitive damages in Texas is not to compensate the injured party but to punish the wrongdoer who caused the injury and to deter other parties from committing similar wrongful acts in the future, evidence regarding actual damages is technically irrelevant to the issue of punitive damages. The sole evidence which is relevant to the issue of punitive damages is that evidence which relates to the five factors, in addition to the reasonable proportionality requirement, which an appellate court must consider when reviewing the reasonableness of a punitive damages award: 1) the nature of the wrong; 2) the character of the conduct involved; 3) the degree of culpability of the wrongdoer; 4) the situation and sensibilities of the parties concerned; and 5) the extent to which such conduct offends a public sense of justice and propriety. *E.g. Alamo Nat'l. Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). All of the evidence which is relevant to these factors will be fully presented at the consolidated trial. At the conclusion of the consolidated trial, the jury will therefore have all of the relevant evidence before it necessary to resolve the punitive damages issue.

The Court's method of submitting the punitive damages issue should prove beneficial in other respects. Because the jury which will decide the issue of punitive damages will not have heard any specific evidence regarding a particular plaintiff's injuries, the Court's procedure reduces the danger that a punitive award may be motivated by sympathy for an injured insulator. The submission of the punitive damages issue for 50 plaintiffs at one consolidated trial will also help to place the issue in its proper perspective as regards asbestos litigation. As previously mentioned, litigation premised on asbestos-related injuries has become a national problem of immense proportion. Because of the magnitude of asbestos litigation, the defendants and some judges and commentators have urged that punitive damages should not be recoverable as a matter of law in the context of asbestos litigation because of public policy considerations. *See Jackson v. Johns-Manville Sales Corp.,* 750 F.2d 1314 (5th Cir.1985). These proponents urge that if present plaintiffs are entitled to recover substantial punitive awards, the economic vitality of the responsible defendants will eventually be destroyed and potentially

vast numbers of future asbestos claimants will be unable to recover even compensatory damages for their injuries. *Id.* It is also argued that repeated assessments of punitive damages fails to serve their dual role of punishment and deterrence when the potential liability of the asbestos defendants is virtually limitless. *Id.*

Current case law restrains this Court from ruling as a matter of law that punitive damages are not recoverable in asbestos litigation because of the aforementioned public policy considerations. The Court is of the opinion, however, that its procedure will encourage a punitive award, if any, which better serves the dual purposes of punitive damages in Texas because the jury, by considering the issue of punitive damages for 50 separate plaintiffs, will receive a more realistic view of asbestos litigation and how the magnitude of the litigation effects the parties involved.

The Court has devised the foregoing procedure for the resolution of its pending asbestos cases because the large number of current claims and the lengthy nature of an asbestos trial precludes the Court from proceeding in the conventional manner of affording each plaintiff an individual trial. An attempt to conduct individual trials for each of the Court's more than 150 cases would result in an intolerable docket backlog and thereby deny allegedly injured plaintiffs their day in court. Individual trial of these claims would also greatly increase the total cost of the litigation, and it is the Court's opinion that the cost of asbestos litigation today is exorbitant with the attorneys and expert witnesses reaping a disproportionate share of the total sums expended.[2] The need to reduce litigation costs seems particularly paramount in light of the defendants' assertions that the injuries of future asbestos claimants may go uncompensated because the defendants possess finite resources. While the Court is of course cognizant that its procedure is subject to some criticism, the Court is none-theless convinced that the procedure is necessary to facilitate the fair and efficient resolution of the Court's pending asbestos cases.

## APPENDIX

The Court submitted the following special interrogatories to the jury:

### QUESTIONS TO THE JURY

#### QUESTION NO. 1

Do you find from a preponderance of the evidence that each of the parties' products listed below was an asbestos-containing insulation product capable of producing dust containing asbestos fibers sufficient to cause bodily injury in its application, use or removal?

Answer "Yes" or "No" for each parties' products:

Armstrong World Industries
    Block Insulation     _____
    Pipe Covering     _____
Celotex Corporation (successor to
    Philip-Carey)
    Block Insulation     _____
    Pipe Covering     _____
Eagle Picher Industries, Inc.
    Block Insulation     _____
    Cement or Mud     _____
    Pipe Covering     _____
Fibreboard Corporation
    Block Insulation     _____
    Pipe Covering     _____
Owens-Corning Fiberglas Corp.
    Block Insulation     _____
    Pipe Covering     _____
Owens-Illinois, Inc.
    Block Insulation     _____
    Pipe Covering     _____
Pittsburgh Corning Corp.
    Pipe Covering     _____
Raymark Industries, Inc.
    (formerly Raybestos-Manhattan)
    Cloth     _____
    Tape     _____
Standard Insulations, Inc.
    Cement     _____
    Pipe Covering     _____

If you have answered Question No. 1 "Yes" as to any product, then answer Question No. 2 as to each such product.

---

**2.** The Rand Corporation has estimated that of the more than one billion dollars asbestos defendants and their insurers have spent on asbes-tos litigation during the past decade, only 37 cents of each dollar was paid to injured plaintiffs as compensation.

## QUESTION NO. 2

Find from a preponderance of the evidence the date, if any, each party listed below knew or should have known that insulators, pipefitters, and electricians were at risk of contracting an asbestos related injury or disease from the application, use or removal of each of such party's asbestos containing products for which you answered "Yes" to in Question No. 1.

With regard to this question you are instructed that in determining whether or not a manufacturer knew or should have known of the dangers involved in the application, use, or removal of his asbestos containing insulation products, a manufacturer is to be held to the knowledge and skill of an expert and at a minimum must keep abreast of scientific knowledge, discoveries and advances and is presumed to know what is imparted thereby. A manufacturer has a duty to test and inspect his products. The extent of research and experiments must be commensurate with the dangers involved.

Answer by placing a date, if any, in the blank provided:

Armstrong World Industries, Inc.
  Block Insulation      _____
  Pipe Covering      _____
Celotex Corporation (Successor to
  Philip Carey)
  Block Insulation      _____
  Pipe Covering      _____
Eagle Picher Industries, Inc.
  Block Insulation      _____
  Cement or Mud      _____
  Pipe Covering      _____
Fibreboard Corporation
  Block Insulation      _____
  Pipe Covering      _____
Owens-Corning Fiberglas Corp.
  Block Insulation      _____
  Pipe Covering      _____
Owens-Illinois, Inc.
  Block Insulation      _____
  Pipe Covering      _____
Pittsburgh Corning Corp.
  Pipe Covering      _____
Raymark Industries, Inc.
  (formerly Raybestos-Manhattan)
  Cloth      _____
  Tape      _____
Standard Insulations, Inc.
  Cement      _____
  Pipe Covering      _____

If you have answered Question No. 1 "Yes" as to any product, then answer Question No. 3 as to each such product.

## QUESTION NO. 3

Find from a preponderance of the evidence whether each of the products listed below was defective as marketed and unreasonably dangerous because of the manufacturer's failure to provide a timely and adequate warning to insulators, pipefitters and electricians after the date you have found, if any, for each product in Question No. 2.

With regard to this question, the Court instructs you that the manufacturer of a product has a responsibility to instruct consumers as to the safe use of its product and to warn users of dangers associated with its product of which the manufacturer either knows or should know at the time the product is sold. The Court further instructs you, however, that a manufacturer need not provide instructions or a warning unless the product was dangerous to an extent beyond that which would be contemplated by the ordinary user of the products with ordinary knowledge common to the community of users as to the products' characteristics.

"Adequate warnings and instructions" means warnings and instructions that are given in such form that they could reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of the use of the product in question; the warning must be of an intensity justified by the magnitude of the risk and the content of the warnings and instructions must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

In answering with respect to each party and each product, you should consider each party and each product individually and separately.

Answer "Yes" or "No" as to each product for which you answered "Yes" in Question No. 1.

Armstrong World Industries, Inc.
Block Insulation      _____
Pipe Covering      _____
Celotex Corporation (successor to Philip Carey)
Block Insulation      _____
Pipe Covering      _____
Eagle Picher Industries, Inc.
Block Insulation      _____
Cement or Mud      _____
Pipe Covering      _____
Fibreboard Corporation
Block Insulation      _____
Pipe Covering      _____
Owens-Corning Fiberglas Corp.
Block Insulation      _____
Pipe Covering      _____
Owens-Illinois, Inc.
Block Insulation      _____
Pipe Covering      _____
Pittsburgh Corning Corp.
Pipe Covering      _____
Raymark Industries, Inc.
(formerly Raybestos-Manhattan)
Cloth      _____
Tape      _____
Standard Insulations, Inc.
Cement      _____
Pipe Covering      _____

If you have answered Question No. 3 "Yes" as to any parties' products then answer Question No. 4 as to such party.

## QUESTION NO. 4

Do you find from a preponderance of the evidence that the manufacturer's marketing of a defective and unreasonably dangerous product, if you have so found, in Question No. 3, constituted gross negligence in that the manufacturers acted with callous and reckless disregard to the welfare and safety of the plaintiffs.

Callous and reckless disregard means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the plaintiffs.

In answering with respect to each party you should consider each party individually and separately.

Answer "Yes" or "No" as to each party for which you answered "Yes" in Question No. 3:

Armstrong World Industries      _____
Celotex Corporation (Successor to Philip Carey)      _____
Eagle Picher Industries, Inc.      _____
Fibreboard Corporation      _____
Owens-Corning Fiberglas Corp.      _____
Owens-Illinois, Inc.      _____
Pittsburgh Corning Corp.      _____
Raymark Industries, Inc.
(formerly Raybestos-Manhattan)      _____
Standard Insulations, Inc.
Cement      _____
Pipe Covering      _____

If you have answered Question No. 4 "Yes" as to any party, then answer Question No. 5 as to such party.

## QUESTION NO. 5

What sum of money, if any, do you find from a preponderance of the evidence should be assessed as punitive damages against each of the following defendants in favor of each plaintiff?

Texas law provides that in your discretion you may assess punitive damages against defendants whom you have found guilty of gross negligence. The purpose of punitive damages is not to compensate the injured party, but to punish the wrongdoer who caused the injury and to deter other parties from committing similar wrongful acts in the future. As I instructed you at the commencement of this trial, this trial is unique in that the cases of fifty plaintiffs have been joined together for the resolution of some, but not all, of the legal issues involved. The remainder of the issues will be resolved by different juries at subsequent trials. One of the issues to be resolved at the subsequent trials is the amount of money, if any, each plaintiff should receive as compensatory damages for his injuries, if any. As regards compensatory damages, each plaintiff who prevails at his subsequent trial will be entitled to recover, upon a proper showing of proof, a fair and reasonable sum of money as compensation for the following elements of injury:

1) Pain, mental anguish, and loss of capacity for enjoyment of life.

2) Past and future medical expenses.

3) Physical impairment and loss of earning capacity in the past and in the future.

Although I have briefly explained to you the elements of compensatory damages which a different jury may be called upon to consider at a subsequent trial, you are in no way to consider these elements in awarding a sum of money, if at all, as punitive damages. In determining whether an assessment of punitive damages is appropriate in this case, you are only to consider what amount of money, if any, will serve to punish each of the defendants to which you have answered "Yes" to in Question No. 4, and deter other parties from engaging in similar conduct in the future.

As I have previously informed you, none of the fifty plaintiffs in this trial have cancer. Accordingly, in considering, if at all, any of the various cancer evidence you have heard during the course of this trial, you may consider the cancer evidence only as it relates, if at all, to the defendants' conduct in failing to warn.

The sum of money which you answer, if any, should *not* represent a lump-sum figure to be divided among the fifty plaintiffs who are joined in this trial. Rather, your answer should represent the amount of money, if any, that *each* plaintiff should receive, assuming of course that he prevails at the subsequent stage of his trial, from each of the defendants which you have found to have been grossly negligent in Question No. 4.

Answer in dollars and cents, if any:

| | |
|---|---|
| Armstrong World Industries | $ |
| Celotex (successor to Philip Carey) | $ |
| Eagle Picher Industries, Inc. | $ |
| Fibreboard Corporation | $ |
| Owens-Corning Fiberglas Corp. | $ |
| Owens-Illinois, Inc. | $ |
| Pittsburgh Corning Corp. | $ |
| Raymark Industries, Inc. (formerly Raybestos-Manhattan) | $ |
| Standard Insulations, Inc. | $ |